Exhibit A

FRANCHISE #45251

DATE EXECUTED  November 13, 2008

# FRANCHISE AGREEMENT

## SUBWAY INTERNATIONAL B.V.

with

Ornela Cere

SIBV EURO 04/08

# FRANCHISE AGREEMENT

This Franchise Agreement (this "Agreement") is made __November 13__, __2008__ between Subway International B.V., a Netherlands limited liability company with a principal office in Amsterdam, The Netherlands ("we" or "us"), and <u>Ornela Core</u> of <u>Athens, GREECE</u> ("you"), for one (1) SUBWAY® restaurant (the "Restaurant") to be located in <u>GREECE</u>.

## RECITALS:

A. Doctor's Associates Inc., a Florida, USA corporation with a principal office in Fort Lauderdale, Florida, USA ("DAI"), owns a proprietary system for establishing and operating restaurants featuring sandwiches and salads under DAI's trade name and service mark SUBWAY® (the "System"). DAI developed the System spending considerable money, time, and effort. The System includes the trademark SUBWAY®, other trademarks, trade names, service marks, commercial announcements (slogans) and related insignia (logos) DAI owns (the "Marks"). The System also includes goodwill associated with the Marks, trade dress, recipes, formulas, food preparation procedures, business methods, forms, policies, trade secrets, knowledge and techniques.

B. Subway Systems International Anstalt, a Liechtenstein establishment with a principal office in Triesenberg, Liechtenstein ("Licensor"), has a non-exclusive license under a License Agreement with DAI to use the System in countries outside the United States of America, Canada, and Australia, to establish and sublicense others to establish SUBWAY® restaurants.

C. Licensor granted a sublicense to us. We operate and franchise others to operate SUBWAY® restaurants using the System, including the Marks, we have licensed.

D. You want access to the System to establish and operate the Restaurant at a location you select and we approve. You acknowledge the System includes confidential and proprietary information which we, our Affiliates (defined below), and the development agents, franchisees and agents of us or an Affiliate, will give you to use only to establish and operate the Restaurant. An "Affiliate" means a person or entity that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another person or entity.

E. We have granted, and will continue to grant, access to the System to others to establish and operate SUBWAY® restaurants. Our goal is to be the number one quick service restaurant system in every market we enter and we plan to open many more outlets in all markets that we choose to develop. This Agreement does not grant you the right to own additional SUBWAY® restaurants. You acknowledge we do not have to sell you additional franchises or consent to your purchase of existing franchises.

F. You acknowledge the consideration we receive from you for granting you the sublicense to use the System consists of the Franchise Fee, the Royalty and performance of your other promises under this Agreement.

G. You acknowledge you personally received our Franchise Offering Circular and its exhibits, including this Agreement (the "Offering Circular"), at or prior to your first personal meeting with our employee, development agent, agent, or representative and at least ten (10) business days before you signed this Agreement, and you signed a Receipt for the Offering Circular. You represent that you have reached the age of majority and have the legal capacity to enter into this Agreement and operate a restaurant business. You represent you carefully reviewed the Offering Circular and had enough time to consult with a lawyer, accountant, or other professional advisor, if you wanted, and you understand and agree to be bound by the terms, conditions, and obligations of this Agreement. You also represent you had full opportunity, with the help of a professional advisor if you used one, to ask us and our employees, development agents, agents, or representatives, all appropriate questions and we and our employees, development agents, agents or representatives answered all of your questions to your satisfaction, except questions on the subject of potential earnings, discussed in the following paragraph. If you did not use a professional advisor, you represent you are satisfied relying on your own education, experience, and skill in evaluating the merits of a franchise offering. You acknowledge that you have read the SIBV Privacy Policy, which is an exhibit to the Offering Circular, and understand that upon becoming a SUBWAY® franchisee, there may be instances where we may share your Personal Information, as defined in the SIBV Privacy Policy, with our affiliates and third parties that may provide services and assistance to you in your day to day store operations, and with prospective franchisees, when required by law. You further acknowledge that if you do not wish to share your Personal Information then you must advise our Privacy Officer in writing.

H. You acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, made any oral, written or visual representation or projection to you of actual or potential sales, earnings, or net or gross profits. You also acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, has made any statements that are contrary to, or different from, the information in the Offering Circular, including but not limited to any statements about advertising, marketing, media support, media penetration, training, store density, store locations, support

2

services and assistance, or the costs to establish or operate a SUBWAY® restaurant, except for any statements you wrote in at Paragraph 16.

I. You represent you understand the risks of owning a business and specifically the risks of owning a SUBWAY® restaurant, and you are able to bear such risks. You acknowledge the success of the Restaurant will depend primarily on your own efforts and abilities and those of your employees, and you will have to work hard and use your best efforts to operate the Restaurant. You also acknowledge other factors beyond our or your control will affect the Restaurant's success, including but not limited to, competition, demographic patterns, consumer trends, interest rates, economic conditions, government policies, weather, local laws, rules and regulations, legal claims, inflation, labor costs, lease terms, market conditions, and other conditions which may be difficult to anticipate, assess, or even identify. You acknowledge that you are subject to all national, state, territorial, provincial and local laws relating to the franchise business. You recognize some SUBWAY® restaurants have failed and more will fail in the future. You understand that your success will depend substantially on the location you choose. You acknowledge our approval of the location for the Restaurant does not guarantee the Restaurant's success at that location and the Restaurant may lose money or fail.

J. This Agreement does not grant you any territorial rights and we and our Affiliates have unlimited rights to compete with you and to license others to compete with you.

K. YOU UNDERSTAND AND ACKNOWLEDGE THAT PARAGRAPH 14 OF THIS AGREEMENT AMENDS ANY EXISTING FRANCHISE AGREEMENTS YOU HAVE WITH US, to include the following provisions of this Agreement: Subparagraph 5.b. (regarding compliance with applicable laws and Operations Manual and charge for non-compliance), Subparagraph 5.c. (regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance and indemnification), Subparagraph 5.e. (regarding a preauthorized account and a letter of credit), Subparagraph 5.f. (regarding reporting information electronically by personal computer based point-of-sale system, SUBWAY® Cash Card Program and other new technology initiatives, high speed broadband connection, real-time sales reporting, and acceptance of debit and credit cards), Subparagraph 5.g. (regarding record keeping), Subparagraph 5.h. (regarding charges for under-reporting), Subparagraph 5.i. (regarding payment of advertising contributions and increasing advertising percentage), Subparagraph 5.m. (regarding use of domain names), Paragraph 6 (regarding relocation), Paragraph 8 (regarding defaults and termination), Paragraph 10 (regarding dispute resolution), Subparagraph 11.f. (regarding interest and late fees), Subparagraph 11.m. (regarding no territorial rights and our unlimited right to compete), Subparagraph 11.n. (regarding compliance with anti-terrorism laws), Subparagraph 11.o. (authorization to use personal information and to conduct an investigative background search), Paragraph 13 (regarding governing law, merger clause and continuing effect), and Paragraph 18 (regarding limitation of liability).

L. YOU UNDERSTAND AND ACKNOWLEDGE ALL DISPUTES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, EXCEPT FOR CERTAIN OF OUR CLAIMS DESCRIBED IN SUBPARAGRAPH 10.f., WILL BE ARBITRATED IN NEW YORK, NEW YORK, USA, UNDER PARAGRAPH 10 BELOW, IF NOT RESOLVED INFORMALLY.

### AGREEMENT:

Acknowledging and agreeing to the above recitals, we and you (the "parties") further agree:

1. **FRANCHISE FEES.** When you sign this Agreement, you will pay us the Franchise Fee checked below, which we will not refund except as we specifically provide for below. **ALL MONETARY VALUES IN THIS AGREEMENT ARE STATED IN EUROS, unless otherwise indicated.** [Check one]:

_____ a. **Standard Fee.** €7,500, or €10,000 if you purchase a franchise on or after July 1, 2008 to be located in a country or region that has reached a significant store density including: Iceland, Gibraltar, Ireland, the United Kingdom, Finland, Germany, Luxembourg, Sweden, and the Netherlands (each referred to as a "Developed Country"). You will pay our standard fee for a first or additional franchise. We may refund one-half (1/2) of your Franchise Fee and cancel this Agreement if you fail to achieve a passing score on the standardized test conducted during the training program as provided in Subparagraph 5.a.(ii). If you sign this Agreement, including the Specific Location Rider, we may refund your Franchise Fee as provided in Subparagraph 5.a.(i) of this Agreement, as amended by the Specific Location Rider.

_____ b. **Reduced Fee.** €3,750, or €5,000 if you purchase a franchise on or after July 1, 2008 to be located in a Developed Country and qualify for the reduced franchise fee. (i) You represent you are currently a SUBWAY® franchisee and all of your franchises are in substantial compliance as defined in the Operations Manual (referenced in Subparagraph 5.b.) and there are no defaults under any Franchise Agreements; or (ii) You are purchasing your first SUBWAY® franchise for a non-traditional location and you are an approved convenience store operator, a food service management company, or other company that provides its own food services; (and you have 50 or more locations or you have a net worth of at least €10 million as shown on an audited balance sheet); or you are a cooperative, foundation, a qualified non-profit charity, hospital, university, college, other school, or governmental agency or entity; or (iii) You are purchasing your first SUBWAY® franchise for a non-traditional location we

3

approved to be located in a portion of an existing facility you own, lease or otherwise control under a management agreement and you are a franchisee in good standing of a nationally branded gasoline retailer. If you are purchasing a franchise for a non-traditional location under clause (ii) or clause (iii), we may disapprove the location within ninety (90) days, terminate this Agreement and refund the Franchise Fee. If any of these representations are not true (based upon the most recent store evaluation) when the Restaurant opens, you agree to pay an additional €3,750, or €5,000 if you purchased a franchise on or after July 1, 2008 to be located in a Developed Country. You may be eligible for a rebate on the reduced franchise fee so long as all of your franchises are in substantial compliance as defined in the Operations Manual (referenced in Subparagraph 5.b.) and there are no defaults under any Franchise Agreements. The rebate will be in the amount of either: 1) €1,875 if you open your restaurant within one year after signing the Franchise Agreement; or 2) €950 if you open your restaurant between one to two years after you sign the Franchise Agreement.

_____ c. **Extension Fee.** €650. You previously signed a Franchise Agreement and paid a Franchise Fee but did not open the Restaurant in the time permitted. The original Franchise Agreement is replaced by this Agreement.

_____ d. **Satellite Fee.** €1,875, or €2,500 if you purchase a franchise on or after July 1, 2008 for a satellite restaurant to be located in a Developed Country. You will operate the Restaurant as a limited restaurant supported by an existing Base Restaurant, as defined in the Satellite Rider. This Agreement for the Restaurant, including the Satellite Rider, is the separate Franchise Agreement for the satellite restaurant. We may refund half of your Franchise Fee if you fail to achieve a passing score on the standardized test conducted during the training program as provided in Subparagraph 5.a.(ii). We will refund the Franchise Fee for the satellite restaurant as provided in Subparagraph 5.a.(i) of this Agreement, as amended by the Satellite Rider.

_____ e. **Add On Fee.** €5,625, or €7,500 if you are an existing franchisee purchasing a franchise on or after July 1, 2008 to be located in a Developed Country at the reduced fee and you want to add an individual to this Agreement who is not an existing SUBWAY® franchisee. Individuals who are existing SUBWAY® franchisees represent their franchises are in substantial compliance with the Operations Manual and there are no defaults under any Franchise Agreements. The Franchise Fee is the reduced Franchise Fee of €3,750, plus an add-on fee of €1,875 to add individuals who are not SUBWAY® franchisees. If the representations of the existing franchisees are not true when a lease is signed, you agree to pay an additional €1,875. If you purchase a franchise on or after July 1, 2008 to be located in a Developed Country, the Franchise Fee is the reduced Franchise Fee of €5,000, plus an add-on fee of €2500 to add individuals who are not SUBWAY® franchisees. If the representations of the existing franchisees are not true when the lease is signed, you agree to pay an additional €2,500.

_____ f. **School Lunch.** €0. A school board, school district, municipality or institutional food service provider (or its nominee), or an individual existing franchisee is signing this Agreement to establish a restaurant in a school (grades K-12). This Agreement includes the School Lunch Rider, the Food Service Provider Rider, or Satellite Rider, as applicable.

__XX__ g. **Transfer.** €0. Franchise No. 45251 owned by Ornela Cere and Gligor Muka ("Seller") was transferred to you. (Seller may have paid a transfer fee.) The Seller's Franchise Agreement is replaced by this Agreement.

_____ h. **Amendment or Renewal.** €0. This Agreement replaces and/or renews the Franchise Agreement dated _____.

**2. ROYALTY PAYMENTS.** You will pay us weekly a Royalty equal to eight percent (8%) of the gross sales from the Restaurant and each restaurant you operate throughout the term of this Agreement. "Gross sales" means all sales or revenues, including catering and delivery, from your business exclusive of Sales Tax (as defined in Subparagraph 5.c.).

**3. PERMITTED ACCESS TO THE SYSTEM AND MARKS.** We grant to you during the term of this Agreement:

a. Continued access to the System, including the loan of a copy of the Operations Manual.

b. Continued access to information pertaining to new developments, improvements, techniques and processes in the System.

c. A limited, non-exclusive sublicense to use the Marks in connection with the operation of the Restaurant at one (1) location at a site we and you approved.

**4. OUR OBLIGATIONS.** We will provide you during the term of this Agreement:

a. A training program, at a location we choose, for establishing and operating a restaurant using the System. You will pay all transportation, lodging, and other expenses to attend the training program.

4

b. A representative or development agent of ours to call on during our representative's or development agent's normal business hours for consultation concerning the operation of the Restaurant.

c. A program of assistance, including periodic consultations with our representative or development agent in a location we choose; an electronic newsletter advising of new developments and techniques in the System; and access during their normal business hours to specified office personnel you may call for consultations concerning the operation of the Restaurant.

5. **YOUR OBLIGATIONS.** You agree to do the following:

a. In regard to the opening of the Restaurant:
   (i) You will open the Restaurant within two (2) years after signing this Agreement. If you do not, this Agreement will automatically expire unless you: 1) request and are granted an extension; 2) pay an extension fee of €650; and 3) sign our then current franchise agreement.
   (ii) Before opening, you must successfully complete the training program we provide under Subparagraph 4.a. You may be dismissed from the training program and this Agreement may be terminated if you fail to act in a professional manner at all times during the training program in accordance with our Code of Business Conduct. Your Franchise Fee will not be refunded. You may be required to achieve a passing score on the standardized test conducted during the training program. If you fail to achieve a passing score, you will have the option to take one final retest. If you fail to achieve a passing score on the final retest or you opt not to take the final retest, we may dismiss you from the training program, cancel this Agreement and refund one-half (1/2) of your Franchise Fee. If more than one individual signs this Agreement, any one of the individuals who does not achieve a passing score on the test may be dismissed from the training program, removed from this Agreement and no portion of the Franchise Fee will be refunded. We will not reimburse you for your travel expenses.
   (iii) The Restaurant will be at a location found by you and approved by us. We or an Affiliate we designate will lease the premises and enter into a Sublease or in limited circumstances a license for the Restaurant ("Sublease") with you. We or our designee will attempt to secure a fair rent for the premises but we cannot represent it will be the best available rent for the area. If you materially breach this Agreement or the lease, we or our designee may cancel the Sublease with you or exercise rights in the lease after giving the notice required in the Sublease or lease.
   (iv) We may authorize you to sign a lease directly with the landlord. To assure that the location remains a SUBWAY® restaurant during the term of this Agreement you must submit the lease for our approval and you may be required to provide us with an Assignable Interest in the lease by signing either: 1) a conditional assignment of the lease; 2) an option, in our favor, for the lease; or 3) any other security interest for the lease permitted in your country. The Assignable Interest will be in a form satisfactory to us and will grant us or our designee the right to take possession of the premises and to assume the lease if you breach either the lease or this Agreement. We or our designee will not have any obligations under the lease unless we or our designee take possession of the premises under the Assignable Interest. You must give us original signed copies of: 1) the lease; 2) the Assignable Interest; and 3) the landlord's consent to the Assignable Interest. If you own the location or if you have a lease directly with the landlord as we may permit, and you materially breach this Agreement or the lease, then at our sole option, your rights in the lease will be assigned to us or our designee under the Assignable Interest of the lease and we may take possession of the premises. The Assignable Interest will be enforceable against you, any corporation you establish to lease the premises for the Restaurant, and any person or entity to which the lease for the Restaurant is transferred.
   (v) You will construct, equip, and open the Restaurant to the specifications contained in the Operations Manual.

b. In regard to applicable laws and the Operations Manual:
   (i) You will operate your business in compliance with all existing and future applicable laws and governmental regulations, including, but not limited to, those concerning labor, taxes, disability, health, and safety. You will be required to pay all fees and costs associated with such compliance. You agree to obtain and keep in force, at your expense, any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the Restaurant. You will register any documents that must be registered, which may include this Agreement, a trademark user agreement, the primary lease, and the Sublease. You will pay all related registration fees, taxes, and preparation costs for the filing, except to the extent limited by law. Upon request, you will forward to us copies of any documentation relating to these items.
   (ii) You will operate the Restaurant in accordance with the Operations Manual we have licensed (the "Operations Manual"), which contains mandatory and suggested specifications, standards and operating procedures, which may be updated from time to time as a result of

5

experience, or changes in the law or marketplace. You will make, at your sole expense, changes necessary to conform to the Operations Manual, including, but not limited to, repairing items not in good condition or not functioning properly, and upgrading and remodeling the Restaurant, including leasehold improvements, furniture, fixtures, equipment, and signs. You acknowledge these requirements are necessary and reasonable to preserve the identity, reputation, and goodwill we developed and the value of the franchise. You agree to make the repairs and the updates, and pay all reasonably required costs within reasonable time periods we establish. You will adhere to quality control standards we prescribe in the Operations Manual or elsewhere with respect to the character or quality of the products you will sell or the services you will perform in association with the Marks. You may be required to purchase all of your beverage products from one supplier we designate, if permitted by local law. You must respond to and satisfy all customer complaints.

(iii) If you fail to operate the Restaurant in accordance with the Operations Manual, we may terminate this Agreement under Subparagraphs 8.a., 8.b. and 8.c., as applicable. If we file a demand for arbitration in accordance with Paragraph 10 for your failure to comply with the Operations Manual, you will pay us, if permitted by local law, an amount equal to two percent (2%) of gross sales of the Restaurant until: 1) the arbitration is disposed of by mutual agreement with us; or 2) you are evicted from the Restaurant premises; or 3) you prevail in arbitration, in which case such charges will be refunded. The monies derived from this charge will cover the costs for enforcement of our compliance standards, administrative expenses and damages to the Marks and goodwill associated with the System.

c. You will be solely responsible for all costs of building and operating the Restaurant, including, but not limited to, sales or use tax, goods and services tax, Value Added Tax, gross receipts tax, excise tax or other similar tax ("Sales Tax"), other taxes, fees, customs, stamp duty, other duties, governmental registrations, construction costs and permits, equipment, furniture, fixtures, signs, advertising, insurance, food products, labor, utilities, and rent. We will not have any liability for these costs and you will reimburse us for any such costs that we must pay in connection with your operation of the Restaurant. You will pay any Sales Tax imposed by law on the Franchise Fee, Royalty, advertising fees, and any other amounts payable under this Agreement, whether assessed on you or on us. If we must make the payment to the taxing jurisdiction for any Sales Tax that is your responsibility under this Agreement, we will pass the amount on to you and you will reimburse us. You must register to collect and pay the Value Added Tax and other Sales Taxes before you open the Restaurant, and you must maintain these registrations during the term of this Agreement. You will recruit, hire, train, terminate, and supervise all Restaurant employees, set pay rates, and pay all wages and related amounts, including any employment benefits, unemployment insurance, withholding taxes or other sums, and we will not have any responsibility for these matters.

The insurance you must obtain and maintain includes, but is not limited to, statutory worker's compensation in the minimum amount required by law, comprehensive liability insurance, including products liability and completed operations coverage, in the minimum amount of €1,300,000. You must also purchase owned business vehicle coverage and hired and non-owned vehicle liability coverage, in the minimum amount of €650,000. You must provide us with a copy of your Certificate of Insurance when you return your signed Sublease or finalize your lease. You will keep all insurance policies in force for the mutual benefit of the parties. With the exception of worker's compensation and owned vehicle coverage, all insurance policies must name as additional insureds, us, Licensor, DAI, our other Affiliates, the Development Agent assigned to the Restaurant (the "Development Agent"), and our agents, representatives, shareholders, partners, directors, officers and employees, and those of Licensor, DAI, our other Affiliates, and the Development Agent (the "Additional Insureds"), as well as the landlord, with such coverage being primary coverage. Your insurance company must agree to give us at least twenty (20) days' prior written notice of termination, expiration, material modification, or cancellation of your policy or cancellation of any of the Additional Insured as an Additional Insured. You agree to defend, indemnify, and save harmless, the Additional Insureds, from and against all liability, injury, loss, cost and expense of any type (including lawyers' fees), and damages that arise in or in connection with your operation of the Restaurant, regardless of cause or any fault or negligence (including sole or concurrent negligence) by the Additional Insureds, which indemnification will not be relieved by any insurance you carry. You acknowledge we may modify or increase the insurance requirements during the term of this Agreement due to changes in experience, and you agree to comply with the new requirements. You acknowledge we may from time to time designate one or more approved insurance brokers and their associated insurance carriers under a master insurance program we establish for franchisees generally, and if we do, you must purchase your coverage from one of the approved insurance brokers and their associated carrier. If you fail to meet our insurance requirements in violation of this Agreement, you will reimburse us for the reasonable costs we incur to enforce this obligation, notwithstanding the provisions of Subparagraph 10.a. These costs include, but are not limited to, mediation and arbitration fees, court costs, attorneys' fees, management preparation time, witness fees, and travel expenses incurred by us or our agents or representatives.

d. You will not own or operate, or assist another person to own or operate, any other business anywhere, directly or indirectly, during the term of this Agreement, which is identical with or similar to the business

reasonably contemplated by this Agreement, including but not limited to the sale of sandwiches, wraps, or salads, without our express written consent, except as our or our Affiliate's duly licensed franchisee. You agree to pay us €10,000 for each business operating in violation of this Subparagraph, plus eight percent (8%) of its gross sales, as being a reasonable pre-estimate of the damages we will suffer. We or an affiliate may also bring an action in any Court having jurisdiction to seek damages, injunctive relief, or both in accordance with Subparagraph 10.f.

    e. You will sign and deliver to us appropriate electronic funds transfer preauthorized draft forms (or forms serving the same purpose) for the Restaurant's checking account before you open the Restaurant. By signing these forms, you authorize us to withdraw money from the account on a timely basis to collect the appropriate Royalty, advertising contributions, interest, late fees, and other charges that you will owe, under this Agreement or under any other Franchise Agreement you have with us. If this form of payment is not available in your area, we may bill these charges to your credit card. If neither electronic funds nor credit cards are available in your area, you will establish an irrevocable standby letter of credit in the amount of €15,000 for our benefit and the benefit of the Franchisee advertising fund. In certain circumstances, you will also authorize us to withdraw money for fees that we paid to a third party on your behalf in connection with the Restaurant.

    f. You will report your gross sales by telephone, facsimile, electronically, or by other means we permit, within two (2) days after the end of the business week (currently Tuesday). You will submit weekly summaries showing results of the Restaurant's operations by the following Saturday, in writing or in electronic form, as we permit, to locations we designate. You agree to use and maintain at the Restaurant a personal computer based point-of-sale system and software compatible with our requirements once a functioning system is available and meets the requirements of your local laws. You agree to install additions, substitutions, and upgrades to the hardware, software, and other items to maintain full operational efficiency and to keep pace with changing technology and updates to our requirements. You will record all sales and designated business information in your system in the manner we specify in the Operations Manual. You will report your information to us electronically as we specify and we may call up or poll your system to retrieve the information at any time. We may estimate gross sales if you fail to report on time. We may withdraw money from your checking account or bill your credit card for Royalty and advertising contributions under the above Subparagraph, for the amounts then due based on reported or estimated sales. We will adjust charges based on estimated gross sales after we determine actual sales.

    You will use and maintain an email address to send and receive electronic mail and attachments on the Internet. You may be required to invest in and implement new technology initiatives, which may include but will not be limited to the SUBWAY® Cash Card Program, LCD or plasma monitors, music, internet TV broadcast, WIFI and Software Management applications, surveillance system, remote ordering through kiosks, PC's or hand held devices, E-learning, and software applications designed to better manage business functions and control costs. You will be responsible for all fees associated with these new technology initiatives. You may be required to use a supplier we designate for any goods and services associated with these initiatives, if permitted by local law. In the future, you will be required to: i) connect the Restaurant to the Internet through a high-speed broadband connection that meets our standards and specifications; and ii) report all transactions of the Restaurant to us electronically at the same time each transaction occurs. You may be required to accept credit or debit cards from customers. You may also be required to obtain a report of all credit and debit transactions and may have to provide us with a copy of this report.

    g. You shall keep full, complete and accurate books and accounts with respect to the Restaurant, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as further prescribed by us from time to time. Such records shall be created exclusively for the Restaurant and shall be separate and apart from records kept for any other business in which you have an interest. You will allow our representatives and the Development Agent and the Development Agent's representatives to enter your business premises without prior notice during regular business hours to inspect, audit, photocopy, and videotape your business operations and records, and to interview the Restaurant's employees and customers. Instead of or in addition to the foregoing, you will, upon our written request, make photocopies of all records we request and forward them to us or our representatives at such address as we designate in writing. We will reimburse you for the reasonable cost of photocopying documents that we request. You agree that we shall have the right to examine your books, records and electronic data; and to perform such audits, inspections, tests and other analyses as we deem appropriate to verify gross sales. You will keep all of the following at the Restaurant for the current year and for the immediate past three (3) years: cash register tapes, control sheets, weekly inventory sheets, deposit slips, business and personal bank statements and canceled checks, sales and purchase records, business and personal tax returns, cash receipts journals, cash disbursements journals, payroll registers, general ledgers, semi-annual balance sheets, profit and loss statements, accounting records, and such other records and information as we may request from time to time. You also grant us permission to examine without prior notice to you, all records of any supplier relating to your purchases, and you hereby authorize such suppliers to release your purchase records to us at such times and places as we request.

    h. In regard to under-reporting of gross sales:

(i) You will pay us, if we or our representatives determine that you under-reported gross sales, all Royalty, advertising contributions and other charges due on the gross sales that were not reported, plus interest and the late fee as provided in Subparagraph 11.f. We may estimate your gross sales to determine whether you under-reported gross sales. If reported gross sales for any calendar year are less than ninety-eight percent (98%) of the actual gross sales for that period, you will reimburse us for all costs of the investigation, including salaries, outside accountant fees, outside attorneys' fees, travel, meals, and lodging. You agree to pay for all costs of any audit that did not occur due to your failure to produce your books and records at the time of audit if we notified you in writing of the audit at least five (5) days before the scheduled date. If you fail to submit all of your information to be audited, we may estimate your sales and charge you.

(ii) If reported gross sales for any calendar year are less than ninety-five percent (95%) of the actual gross sales for that period, you must also pay us a charge equal to one hundred percent (100%) of the amount of Royalty, advertising contributions and other charges due on the gross sales that were not reported, if permitted by local law. This charge covers the damages we suffer for your under-reporting, which is injurious, and prejudicial to the System, the Marks and the goodwill associated therewith. We will not impose this charge if you sufficiently prove to us that you have diligently used our control systems each week and that your under-reporting was due solely to employee theft that could not be detected with our control systems.

i. You will pay us, four and one-half percent (4 ½%) of gross sales of the Restaurant on a weekly basis. We will deposit that money into the Subway Franchisee Advertising Fund Trust ("SFAFT"), provided that SFAFT: (a) follows a Transparency Policy that we approve and fully discloses all material financial data about the fund to franchisees; (b) is prudent with expenses; and (c) works closely with us to produce and place advertising to enhance the SUBWAY® brand. If SFAFT does not adhere to the above requirements, we may deposit your advertising contributions into an advertising fund established for the benefit of franchisees in the System that follows those requirements and is managed by elected franchisees. At any time, franchisees may increase the advertising percentage for the country or any local market designated by the advertising fund temporarily or permanently by a two-thirds (2/3) vote on the basis of one (1) vote for each operating restaurant.

The required advertising percentage reflects an increase of one percent (1%) that has been approved by franchisees in some countries. If this increase has not been approved by the franchisees in the country where the Restaurant will be located, you will pay at the original rate of three and one-half percent (3 ½%) until the increase has been approved in your country by a two-thirds (2/3) vote on the basis of one (1) vote for each operating restaurant. Signing this Agreement is your vote for the Restaurant, and under Paragraph 14, for all SUBWAY® restaurants you own, to permanently increase the advertising percentage to four and one-half percent (4 ½%). Any vote in the local market for a higher or longer term additional local advertising percentage will govern.

We and our Affiliates or another entity that we designate may negotiate additional advertising contributions and programs with suppliers. We or our Affiliate may designate that these advertising contributions shall be forwarded to a fund to be spent on advertising and related expenses for the benefit of franchisees. You acknowledge advertising contributions may not benefit franchisees in any area in proportion to the amounts they paid.

j. You will not place "For Sale" or similar signs at or in the general vicinity of the Restaurant or use any words in any advertising that identify the business offered for sale as a SUBWAY® restaurant.

k. You will make prompt payment of all charges you owe to us, our Affiliates, your vendors, and the landlord of the premises, in addition to Royalty and Franchisee advertising fund contributions, and pay all Sales Tax, other taxes, and debts of the Restaurant as they become due.

l. You will research the laws, building codes, restaurant and equipment rules, and business regulations to be certain that this Agreement and all other agreements entered into regarding this franchise are legal and binding in your jurisdiction. You acknowledge we do not know these matters for every market or every country. You will defend, indemnify, and save us, Licensor and DAI harmless if any portion of this Agreement is illegal. You acknowledge we do not know the market conditions in every market or what types of locations will work best or even if the Restaurant can succeed in the market you select. You agree you must research the market conditions to determine if the Restaurant is likely to be successful in your market and to find a suitable location and negotiate a lease for the location. You acknowledge any help from us to find a location or negotiate the lease, and our approval of the site, do not guarantee success and the Restaurant may lose money or fail.

m. You will always indicate your status as an independent franchised operator to others and on any document or information released by you in connection with the Restaurant. You will locate sources for the required food and equipment to operate the Restaurant in compliance with this Agreement and the Operations Manual. You acknowledge you may experience significant difficulty in doing so in your market.

n. You will use or display the Marks on materials and stationery used in connection with the Restaurant only as we permit and as provided in this Agreement or in the Operations Manual. You will display the following notice, in your local language, in a prominent place at the Restaurant: *"The SUBWAY® trademarks are owned by Doctor's Associates Inc. and the independent franchised operator of this restaurant is a licensed user of such trademarks."*

o. You will operate and promote the Restaurant under the name SUBWAY® or other name we direct without prefix or suffix added to the name. You will not use the word "SUBWAY" as part of a corporate or other business name. You will not license or purchase vehicles, fixtures, products, supplies or equipment, or incur any obligations except in your individual, corporate or other business name. Any sign face bearing the name SUBWAY® will remain our property even though you may have paid a third party to make the sign face. You will not use the Marks in a manner that degrades, diminishes, or detracts from the goodwill associated with the Marks nor will you use the Marks in a manner which is scandalous, immoral, or satirical. You agree to promptly change the manner of such use if requested to do so by us. You will not establish a local domain name for a website using the word "SUBWAY" without our prior written authorization. The domain name must be registered under the name of SIBV or its designee. We will require you to cancel your registration of the domain name if you fail to obtain our prior written authorization. At our request, you must remove any inappropriate information we deem not to be in the best interest of the SUBWAY® franchise system. All present or future goodwill associated with the Marks belongs to DAI. You agree not to contest the validity or ownership of any of the Marks, or to assist any other person to do so. You agree you do not have and you will not acquire any ownership rights in the Marks, and you will not register or attempt to register any of the Marks. You agree to assign and transfer to DAI your rights in or registrations of the Marks that you have or may have. All references to the Marks in this Agreement include any additional or replacement Marks associated with the System that we authorize you to use.

p. You acknowledge the System includes confidential and proprietary information, including, but not limited to customer lists, vendor lists, products, recipes, formulas, specifications, food preparation procedures, devices, techniques, plans, business methods and strategies, organizational structure, financial information, marketing and development plans and strategies, advertising programs, creative materials, media schedules, business forms, drawings, blueprints, reproductions, data, Franchise Agreements, business information related to franchisees, pricing policies, trademarks, published materials including the mark SUBWAY® and variations thereof, documents, letters or other paper work, trade secrets, know-how, information contained in the Operations Manual, and the *Subway to Subway* publication, and all information we or our Affiliates designate as confidential ("Confidential Information"). Confidential Information will remain our property or our Affiliate's property.

During the term of this Agreement you will not, without the express written consent of our board of directors, disclose, publish, or divulge any Confidential Information to any person, firm, corporation or other entity, or use any Confidential Information, directly or indirectly, for your own benefit or the benefit of any person, firm, corporation or other entity, other than for our benefit. You agree that you will only disclose such Confidential Information to those employees that need such Confidential Information in the course of their duties and shall only reveal or transmit the Confidential Information to them after advising them that the Confidential Information has been made available to you subject to this Agreement and they agree to be bound by the confidentiality terms of this Agreement. You acknowledge that if you violate this provision, substantial injury could result to us, our Affiliates, you and other SUBWAY® franchisees. If you violate this provision, you will be liable to us for our damages and we may also seek to enjoin your activities under Subparagraph 10.f. You will return all written Confidential Information, including all reproductions and copies thereof promptly upon our request. In the event that you are requested or required (by oral interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or similar process) to disclose any part of Confidential Information, you shall provide us with prompt written notice of any such request or requirement so that we may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Subparagraph. If in the absence of a protective order or other remedy or waiver, you are legally compelled to disclose Confidential Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, you may, without liability hereunder, disclose to such tribunal only that portion of Confidential Information which your legal counsel advises that you are legally required to disclose.

Confidential Information shall not include, and the foregoing restrictions shall not apply to, any information or materials (a) which becomes generally known to the public other than as a result of a disclosure by you or your representative; (b) which was disclosed to you in written form, provided that you did not have reason to believe that the source of the information may have been bound by a nondisclosure agreement with other contractual, legal or fiduciary obligations of confidentiality to us or any other party with respect to such information or materials; (c) becomes available to you on a non-confidential basis from a source other than us, provided that such source is not bound by a nondisclosure agreement with other contractual, legal or fiduciary obligations of confidentiality to us or any other party with respect to such information or materials; or (d) which is independently developed by Recipient without the use of Confidential Information. The burden of proving that Confidential Information may be disclosed pursuant to the exception set forth in this subparagraph shall be on the Recipient.

**6. RELOCATION OF THE RESTAURANT.** You may relocate the Restaurant only with our prior written approval. You will have one (1) year to relocate the Restaurant and you will pay all expenses and liabilities to terminate the lease and move as they become due.

**7. TERM OF AGREEMENT.** If, under local law, this Agreement must be registered then it will not become effective until it is. The term of this Agreement is twenty (20) years from the date of this Agreement and will automatically renew for additional twenty (20) year periods unless either party chooses not to renew and sends written notice to the other at least six (6) months before the expiration of any twenty (20) year period. Upon renewal you have the option to either: i) continue under the terms of this Agreement and the royalty rate will increase to ten percent (10%) with all other terms and conditions of this Agreement remaining the same, or ii) you may sign our then current Franchise Agreement which will replace this Agreement and which may contain terms or conditions that differ from this Agreement, including financial terms, except for the royalty rate which will remain at eight percent (8%). This Agreement will be automatically renewed under option i) unless you send written notice of your intent to renew under option ii) at least six (6) months prior to expiration of this Agreement. There will be no renewal fee.

**8. TERMINATION AND EXPIRATION PROVISIONS.**

a. If we give you ten (10) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement effective immediately upon the expiration of the ten (10) day period, if: (i) you abandon the Restaurant, or (ii) you fail to pay any money you owe us, our Affiliates, the Franchisee advertising fund, the landlord of the premises under the Sublease or a direct lease, or any amounts we may become liable to pay because of your action or omission, or (iii) you are evicted from the Restaurant location for non-payment of rent or related charges, or (iv) you fail to register and maintain your registration to collect and pay the Value Added Tax and all other Sales Taxes, or (v) you fail to obtain from us or the Development Agent in your area approval to open your Restaurant; or (vi) you re-open your restaurant after a re-location without obtaining the necessary approval from us or the Development Agent in your area to re-open. The notice will specify the default and provide you ten (10) days to remedy the default from the date of delivery of the notice.

b. If we give you ninety (90) days' written notice, we may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement effective immediately upon the expiration of the ninety (90) day period, if you (i) do not substantially perform all of the terms and conditions of this Agreement not otherwise covered in Subparagraph 8.a., or (ii) you lose possession of the premises where the Restaurant is located, or (iii) you become insolvent, make an assignment for the benefit of creditors or seek bankruptcy relief, either reorganization or liquidation, in any court, legal or equitable, or (iv) you lose any permit or license which you need to operate the Restaurant, or (v) you fail to comply with your duties under this Agreement or the Operations Manual, or (vi) if you use the Restaurant or the Restaurant location for any unauthorized use that we believe is injurious or prejudicial to the System, the Marks or the goodwill associated therewith. The notice will specify the default and provide you sixty (60) days to remedy the default from the date of delivery of the notice. If you cure the default within sixty (60) days, the notice will be void.

c. We may, at our option and without prejudice to any of our other rights or remedies provided under this Agreement, terminate this Agreement without an opportunity to remedy the default unless prohibited by law if i) you fail to comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities, or ii) intentionally under-report gross sales, falsify financial data or otherwise commit an act of fraud, or iii] you are convicted or plead guilty or "nolo contendere" to a felony, a crime of violence, moral turpitude, an indictable offense, unfair or deceptive trade practices , or any other crime or offense that we believe is injurious or prejudicial to the System, the Marks or the goodwill associated therewith, or iv] if you use the Restaurant or the Restaurant location for any illegal use, or v) we are prohibited from doing business with you under any anti-terrorism law, including but not limited to the USA PATRIOT Act or Executive Order 13224 enacted by the United States Government and any such laws applicable in your country, or vi) you are dismissed from the training program, or vii) if you violate the covenant not to compete set forth in Subparagraph 5.d. of this Agreement.

After the second notice of a default under Subparagraph 8.a. or 8.b., any subsequent default in the following twelve (12) month period will be good cause for a final termination without providing you an opportunity to remedy the default or even if you remedy the default.

d. Our rights to notify you of a default and to terminate this Agreement are not affected by the notification and arbitration procedures under Paragraph 10. If we terminate this Agreement and you dispute the termination, you must file a demand for arbitration as provided in Subparagraph 10.h. in order to seek reinstatement. We may enforce the termination by filing for arbitration and then court confirmation of the arbitration award without first seeking informal discussions.

e. Upon termination or expiration of this Agreement, all of your rights under this Agreement will terminate. You must change the appearance of the Restaurant, unless we instruct you otherwise, so it will no longer be

10

identified as a SUBWAY® restaurant, and you must stop using the System, including the Marks, signs, colors, structures, personal computer based point-of-sale system software developed for SUBWAY® restaurants, printed goods and forms of advertising indicative of our sandwich business and return the Operations Manual to us. We will be authorized to cancel the registration of any Trademark User Agreement, and you agree to sign any documents necessary to cancel the registration. You are required to cancel any permits, licenses, registrations, certifications or other consents required for leasing, constructing, or operating the Restaurant. If you fail to do so within a reasonable time, we are authorized to cancel them for you. Any costs for cancellation will be borne by you. If you breach this provision, you will pay us €175 per day for each day you are in default, as being a reasonable pre-estimate of the damages we will suffer. We or an affiliate may also bring an action in any Court having jurisdiction to seek damages, injunctive relief, or both in accordance with Subparagraph 10.f.

    f. If any of the provisions above which permit us to terminate the franchise violate applicable local law, local law relating to termination will prevail over the offending provisions.

    g. For three (3) years after the termination, expiration or transfer of this Agreement, you will not directly or indirectly engage in, or assist another to engage in, any sandwich business within three (3) miles or five (5) kilometers of any location where a SUBWAY® restaurant operates or operated in the prior year, if permitted by local law. You agree to pay us €10,000 for each sandwich business location you are associated with in the restricted area in violation of this Subparagraph, plus eight percent (8%) of the gross sales of such location during the three (3) year period, as being a reasonable pre-estimate of the damages we will suffer. We or an affiliate may also bring an action in any Court having jurisdiction to seek damages, injunctive relief, or both in accordance with Subparagraph 10.f. Nothing in this Subparagraph or any other provision of this Agreement grants you any territorial or other exclusive rights.

    h. Upon termination, expiration or transfer of this Agreement, you agree to remain bound by the provisions of confidentiality and non-disclosure under Subparagraph 5.p. of this Agreement. You acknowledge that all Confidential Information will remain our property or our Affiliate's property. You will not at any time after termination, expiration or transfer of this Agreement, without our prior written consent, disclose to any unauthorized person or entity, or use for the benefit of any unauthorized person or entity, any Confidential Information.

    i. If you breach any other agreement with us, at our option it will also be a breach of this Agreement.

    j. Upon termination or expiration of this Agreement, all telephone listings, telephone numbers, Internet addresses and domain names used by the public to communicate with the Restaurant will automatically become our property if permitted by local law. In any event, you agree not to use any telephone numbers, Internet addresses or domain names associated with the Restaurant after the termination or expiration of this Agreement.

    k. We have the right to repurchase the Restaurant within thirty (30) days of termination or expiration of this Agreement at fair market value minus any money you owe us, our affiliates or the landlord. If we do not purchase the Restaurant, you are responsible for obtaining a termination and mutual release of the lease from the landlord of the premises on which the Restaurant is located. You are responsible for all costs associated with obtaining the termination and mutual release, including but not limited to any amount owed to the landlord.

### 9. TRANSFER AND ASSIGNMENT OF THE RESTAURANT.

    a. You may only transfer the Restaurant with this Agreement and only with our prior written approval, as provided in this Paragraph 9. You may transfer the Restaurant and this Agreement to a natural person or persons (not a corporation), provided: (i) you first offer, in writing, to sell the Restaurant to us on the same terms and conditions offered by a bona fide third party purchaser, we fail to accept the offer within thirty (30) days, and we approve your contract with the purchaser ; (ii) each purchaser has a satisfactory credit rating, and is of good moral character; (iii) each purchaser, if required, received a passing score on the standardized test (if not already a SUBWAY® franchisee); (iv) each purchaser attended and successfully completed our training program or agrees to attend our training program promptly after the sale (and then must successfully complete the training program or will be in default under the Franchise Agreement); (v) each purchaser received the required disclosure documents in accordance with our policies and national and local laws, rules, and regulations, and signs the then current form of Franchise Agreement which will amend and replace this Agreement and may contain terms that differ from this Agreement, including financial terms, and assumes the Sublease for the Restaurant; (vi) you pay in full all money you owe us, our Affiliates, and the Franchisee advertising fund, for all your SUBWAY® restaurants and you are not otherwise in default under this Agreement; (vii) you pay us €3,750, or €5,000 if you signed this Agreement for a franchise on or after July 1, 2008 to be located in a Developed Country as defined in Subparagraph 1.a., (plus any applicable Sales Tax) for our legal, accounting, training, and other expenses we incur in connection with the transfer; (viii) you transfer the Operations Manual for the Restaurant to the purchaser on the date of transfer; (ix) you deliver a general release in favor of us, the Development Agent and our Affiliates, and agents, representatives, shareholders, partners, directors, officers and employees of ours and of the Development Agent and our Affiliates, signed by you and each purchaser; and (x) at or prior to the time of the transfer you bring the Restaurant into full

compliance with our then current standards set forth in the Operations Manual. All transfer documents will be in English in a form satisfactory to us. During the transfer process, we may share your personal information with its affiliates or prospective franchisees in accordance with the procedures set forth in our Privacy Policy. If you do not want your information shared during the transfer process, you must opt out either prior to the completion of the store transfer or at the time of the transfer. All opt out requests should be directed to the Privacy Officer, as set forth in our Privacy Policy.

    b. You may assign your rights under this Agreement to operate the Restaurant (but not this Agreement) to a corporation (or similar entity) provided: (i) the corporation is newly organized and its activities are confined exclusively to operating the Restaurant; (ii) you are, and remain at all times, the owner of the controlling voting interest and majority ownership interest (more than 50%) of the corporation; (iii) each individual who signs this Agreement owns no less than twenty-five percent (25%) of the corporation, unless we allow otherwise pursuant to your written request; (iv) the corporation delivers to us a written assumption of your obligations under this Agreement; (v) all shareholders of the corporation deliver to us a written guarantee of the full and prompt payment and performance by the corporation of all its obligations to us under the assignment; (vi) you acknowledge to us in writing that you are not relieved of any personal liability; and (vii) you deliver a general release described in Subparagraph 9.a., signed by you, the corporation, and each shareholder of the corporation. You will also remain personally liable under the Sublease. You acknowledge that any judgment awarded in our favor, pursuant to this Agreement, may be enforced against you, the corporation and its successors or assigns.

    c. Your rights under this Agreement may pass to your next of kin or legatee upon your death. Each such transferee must deliver a written assumption to us, agree in writing to attend our next training session and may also be required to achieve a passing score on the standardized test (if not already a SUBWAY® franchisee). Each transferee must then successfully complete our training program or will be in default under this Agreement. The transferees will also assume the Sublease in writing.

    d. We may transfer and assign this Agreement without your consent, and this Agreement will inure to the benefit of our successors and assigns. You consent that any of our Affiliates or their designees may succeed to our interests or the interests of our designee in the Sublease or the lease under the Assignable Interest.

    **10. DISPUTE RESOLUTION.** The parties want to settle all issues quickly, amicably, and in the most cost effective fashion. To accomplish these goals, the parties agree to the following provisions that will apply to resolve any dispute or claim arising out of or relating to this Agreement, or any other Franchise Agreement the parties have with each other (a "Dispute"):

    a. The parties agree to first notify each other in writing of any Dispute. The written notification will specify, to the fullest extent possible, the notifying party's version of facts and all elements of the Dispute. You agree to use your best efforts to communicate with us, including the Ombudsmen Department, and the recognized franchisee owners representative organization, to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days after receipt of the notice of the Dispute, we or you may commence arbitration as provided in this Paragraph 10. Each party will be responsible for its own costs, including lawyers' fees, in any arbitration or court proceeding, except as otherwise provided in this Paragraph 10.

    b. The parties agree that except as otherwise provided in this Agreement, the arbitration procedures will apply to all Disputes, including the breach of this Agreement and any alleged precontractual representations or conduct, applicable national and local franchise disclosure or franchise relationship laws, unfair trade practice laws, or similar laws.

    c. The parties will arbitrate any Dispute the parties do not settle under the discussion procedures above, and any Dispute which this Agreement provides will be submitted directly to arbitration, except as provided in this Agreement. The arbitration will be held in accordance with the United Nations Commission on International Trade Regulations and Law (UNCITRAL) Arbitration Rules administered by an arbitration agency, such as the International Centre for Dispute Resolution, an affiliate of the American Arbitration Association. The arbitration will be conducted in English and decided by a single arbitrator unless the law of the country where the Restaurant is located requires three (3) arbitrators. Any court having jurisdiction may enter judgment on the arbitrator's award. Except as provided in this Agreement, a party must commence and pursue arbitration to resolve Disputes before commencing legal action. We will honor validly served subpoenas, warrants and court orders.

    d. The parties agree that New York, New York, USA shall be the site for all arbitration hearings held under this Paragraph 10.

    e. If a court of competent jurisdiction decides the requirement to arbitrate a Dispute is unenforceable because applicable law does not permit the type of claim involved to be resolved by arbitration, or because this Agreement limits a party's rights or remedies in a manner applicable law does not permit, or for any other reasons,

then under Subparagraph 11.c., the entire arbitration clause is not void. Only the portions of the arbitration clause with respect to such claim or claims as are necessary to comply with applicable law will be invalid and considered severable, but the remainder will be enforced.

 f. You recognize if you breach the provisions of this Agreement that prohibit you from infringing intellectual property rights in the Marks or in copyrighted items, or from disclosing Confidential Information, or from competing, you may cause irreparable harm to us, our Affiliates, other franchisees, and the System as a whole. We or an Affiliate may bring an action in any court having jurisdiction, in accordance with the laws of that jurisdiction, in connection with any such breach, and may seek damages, injunctive relief, or both. Notwithstanding any other provision of this Agreement, if a breach specified in this Subparagraph 10.f. occurs, both parties agree that due to the likelihood of such breach causing immediate and irreparable harm we do not have to provide you with written notice of such breach before seeking any damages, injunctive relief or both and that this Agreement may be terminated by us immediately. Notwithstanding any other provision of this Agreement, the arbitration procedures above, and the monetary limitation on damages in Paragraph 18 below, will not apply to any such breach.

 g. You agree the only person or entity from which you may seek damages or any remedy for any Dispute, including the breach of this Agreement, is us, or our successor or assign. You agree you will not name our shareholders, directors, officers, employees, or agents, or Licensor, DAI, our other Affiliates, or the Development Agent, or the shareholders, directors, officers, employees, agents, or partners of Licensor, DAI, our other Affiliates, or the Development Agent, in any arbitration or legal action. You agree none of these other entities or individuals will be liable to you; only we will. You acknowledge we have relied on this representation in signing this Agreement.

 h. Notwithstanding any other provision in this Agreement, we may send default notices to you and terminate this Agreement without first giving notice of a Dispute or pursuing arbitration. You may dispute the termination by filing a demand for arbitration within thirty (30) days after the effective date of the termination, without first giving notice of a Dispute. You may only demand a Declaratory Judgment in the arbitration to determine if the termination was invalid and only request an award reinstating this Agreement. The arbitrator may only rule on the validity of the termination and the award may only grant or deny the request for reinstatement. You will waive the remedy of reinstatement if you do not file for arbitration within the time allowed. We may file a demand for arbitration requesting validation of the termination of this Agreement and appropriate relief and may seek court confirmation of any arbitration award without first giving notice of a Dispute.

 i. If a party: (i) commences action in any court, except to compel arbitration, or except as specifically permitted under this Agreement, prior to an arbitrator's final decision, or (ii) commences any arbitration or litigation in any forum except where permitted under this Paragraph 10, then that party is in default of this Agreement. The defaulting party must commence arbitration (or litigation, if permitted under this Paragraph 10), in a permitted forum prior to any award or final judgment. The defaulting party will be responsible for all expenses incurred by the other party, including lawyers' fees. If a party defaults under any other provision of this Paragraph 10, or under any provision of Paragraph 18, including, but not limited to, making a claim for special, incidental, consequential, punitive, or multiple damages, or damages in excess of the amount permitted under this Agreement, or you name a person or entity in any arbitration, or legal proceeding other than us, the defaulting party must correct its claim. The defaulting party will be responsible for all expenses incurred by the other party, or the improperly named persons or entities, including lawyers' fees, and will be liable for abuse of process.

 j. Any settlement or arbitration award will have a binding effect only on the actual Dispute arbitrated, and will not have any collateral effect on any other Dispute whatsoever, whether in litigation, arbitration, or other dispute resolution proceeding. You will arbitrate or litigate each Dispute with us on an individual basis. You will not consolidate your Dispute in any arbitration or litigation action, with a claim by any other franchisee, individual, or entity.

 k. If a court of competent jurisdiction decides the arbitration clause in Subparagraph 10.c. is unenforceable, and after any and all final appeals the decision is upheld, the parties agree to litigate a Dispute in the United States District Court for the District of Connecticut, USA. In the event that the arbitration clause is held unenforceable and the parties are subject to litigation in a local court of competent jurisdiction, local law shall apply. The parties waive any right to trial by jury, except where waiver is prohibited by applicable law.

 l. The parties submit to the jurisdiction of any tribunal or court in accordance with Subparagraph 10.c. and Subparagraph 10.k., for arbitration or litigation of any Dispute, and waive any right to object to the location being inconvenient. Such jurisdiction will be exclusive, except for our right or our Affiliates' rights under Subparagraph 10.f. to bring an action in any court having jurisdiction, to protect intellectual property rights in the Marks, copyrighted items, and Confidential Information, or to enforce the covenants not to compete.

 m. We or you must start the action permitted under this Paragraph 10 to resolve a Dispute, whether by giving notice of the Dispute or filing for arbitration, litigation, or any other permitted proceeding, within one (1) year from the time the events occurred which give rise to the Dispute, or the claim will be barred, except we may bring a