claim under Subparagraph 5.h. for under-reported sales within five (5) years from the under-reporting or the maximum time period allowed by law for up to five (5) years. We or you may bring an action for indemnification within one (1) year after we or you have notice of the claim that gives rise to the indemnification action. The parties recognize this Subparagraph may have shorter time limits than applicable law will permit.

n. Our waiver of any of your defaults will not constitute a waiver of any other default and will not prevent us from requiring you to strictly comply with this Agreement.

o. The sublessor, whether us or our designee, may evict you from the Restaurant if you breach the Sublease. If local law allows, we or our designee may evict you if you breach a direct lease with the landlord if we or our designee exercise the rights under the Assignable Interest of lease. The provisions of this Paragraph 10, regarding Disputes, do not apply to our actions or our designee's actions to enforce the terms of the Sublease or the lease under this Agreement, and we or our designee do not have to give notice of the dispute or claim or file an arbitration to enforce rights under the Sublease.

**11. OBLIGATION OF THE PARTIES.** The parties also agree as follows:

a. You are, and will at all times be identified as, a natural person and an independent contractor. You are not our agent, partner, or employee. This Agreement does not create a partnership, joint venture, agency, or fiduciary relationship.

b. All or any part of your rights and privileges under this Agreement will return to us if for any reason you abandon, surrender, or suffer revocation of your rights and privileges.

c. If, for any reason, any court, agency, or tribunal with valid jurisdiction in a proceeding to which we are a party, decides in a final, non-appealable ruling, that a Portion of this Agreement is contrary to, or in conflict with any applicable present or future law, rule, or regulation, after giving such portion the broadest legal interpretation possible, then that portion will be invalid and severable. A Portion is defined as any distinct or separable provision of this Agreement, which may consist of an entire paragraph or as little as a phrase stated in a paragraph or subparagraph. The remainder of this Agreement will not be affected and will continue to be given full force and effect if removing the invalid Portion does not change the intent of this Agreement. Any invalid Portion will be deemed not to be a part of this Agreement as of the date the ruling becomes final if you are a party to the proceedings, or upon your receipt of notice of nonenforcement from us. If removing the invalid Portion does change the intent of this Agreement, the parties agree to amend that Portion to conform to applicable law and keep the intent of this Agreement. If the parties cannot amend this Agreement to maintain the intent, we may, at our option, cancel this Agreement immediately without any obligation or prejudice to our other rights or remedies. If the parties discover this Agreement was invalid at the time it was signed, we may, at our option, declare this Agreement null and void by giving you thirty (30) days' notice. If a court, agency, or tribunal decides a covenant not to compete is too broad as to scope, time, or geographic area, the parties authorize the court, agency or tribunal to modify the covenant to the extent necessary to make it enforceable.

d. No previous course of dealing or usage in the trade not specifically set forth in this Agreement will be admissible to explain, modify, or contradict this Agreement.

e. The parties will give any notice required under this Agreement in writing, and will send it by a mail service which uses a tracking system that provides evidence of the date the notice is received, such as DHL Worldwide Express or Federal Express. We will address notices to you at the Restaurant or at your home address until you designate a different address by written notice to us. You must notify us of any address changes, including changes to your electronic mail address. You will address notices to us to Subway International B.V., Prinsengracht 13, 1015 DK, Amsterdam, The Netherlands, until we designate a different address by written notice to you. We and you will send required copies of all notices to the Attention of the Legal Department, Doctor's Associates Inc., 325 Bic Drive, Milford, CT 06461 USA. Any notice will be deemed given at the date and time it is received, or refused, or delivery is made impossible by the intended recipient.

f. If your payment is more than one (1) week late you will pay a late fee equal to ten percent (10%) (or the maximum rate allowed by law, if lower) on any Royalty, advertising contributions, or other charges you will owe us under this Agreement. Also, you will pay interest on all your past-due accounts at the maximum rate allowed by law in the jurisdiction in which our principal office is located or the Restaurant is located, whichever is higher.

g. You must immediately notify us of any infringement of or challenge to your use of any of the Marks, or claim by any person of any rights in any of the Marks. We will indemnify you for all damages for which you are held liable in any proceeding arising out of the use of any of the Marks in compliance with this Agreement, provided you notify us promptly, cooperate in the defense of the claim, and allow us or our Affiliate to control the defense of the action. In some countries, we are aware of prior registrations of the trademark SUBWAY and third parties owning trademarks that may supersede our use of the Marks, which are disclosed in Item 13 of the Offering Circular. We cannot guarantee that you will have the right to use the Marks in these countries, or that you will not

14

have to share use of the trademark SUBWAY with third parties in these countries. If a third party challenges any of the Marks claiming infringement of alleged prior or superior rights in the Mark, we will have the option and right to modify or discontinue use of the Mark and adopt substitute Marks in your geographical business areas and in other areas we select. Our liability to you under such circumstances will be limited to your cost to replace signs and store advertising materials. You acknowledge and agree we and our Affiliates have the exclusive right to pursue any trademark infringement claims against third parties. You waive the benefit of any applicable local law granting you enforcement rights.

h. If we terminate this Agreement and we must purchase the Restaurant's equipment, leasehold improvements, or both, under any applicable local law, rule, regulation, or court decision, the purchase price will be the original cost, less depreciation and amortization, based on a five (5) year life under the straight-line method.

i. If the landlord terminates the lease for the Restaurant and an arbitrator or court determines you did not breach the Sublease and it was our fault or our Affiliate's fault the landlord terminated the lease, our obligation to you will be limited to the original cost of your leasehold improvements, less depreciation based on a five (5) year life under the straight-line method. We will pay you when you reopen the Restaurant in a new location. If the arbitrator or court determines you breached the Sublease or it was not our fault or our Affiliate's fault the landlord terminated the lease, we and our Affiliate will have no obligation to you for termination of the lease.

j. If you believe that we are in default under this Agreement, you must give us written notice within ninety (90) days of the start of the default clearly stating each act or omission constituting the default. If we do not cure the default to your satisfaction within sixty (60) days after we receive your notice, you may give us notice a Dispute exists. The parties will work diligently to attempt to resolve the Dispute. If the parties do not resolve the Dispute within thirty (30) days, the parties may follow the procedures to start arbitration under Paragraph 10. Any default contained in your notice will be considered cured if you do not file for arbitration.

k. You may be required by law to withhold taxes on all payments to us. If you are required to withhold such taxes, upon signing this Agreement, you will provide us documentation containing the tax rates. We and you will cooperate to furnish documents the taxing authorities require to establish the applicable withholding tax rate. You will pay all taxes you withhold to the appropriate authorities and send us a tax certificate or other evidence confirming payment. Each of the parties will notify the other within thirty (30) days after receiving notice of any audit or other inquiry from the taxing authorities about payments made to us under this Agreement. The parties will cooperate in responding to such audit or other inquiry. You will pay us Sales Tax or other tax assessed on all payments you make to us that we must collect from you or pay ourselves to the taxing authority. You will hold us harmless and/or reimburse us for any tax liability, interest or penalties we incur due to your failure to withhold taxes required by law.

l. You will pay us any applicable Sales Tax on behalf of the local taxing authority at the same time and in the same manner you pay for the taxable goods or services, whether or not the requirement is specifically stated in this Agreement.

m. You understand and acknowledge this Agreement does not grant you any territorial rights and there are no radius restrictions or minimum population requirements which limit where we can license or open another SUBWAY® restaurant, unless provided under local law. We and our Affiliates have unlimited rights to compete with you and to license others to compete with you. You understand and acknowledge we and our Affiliates retain the exclusive unrestricted right to produce, distribute, and sell food products, beverages, and other products, under the SUBWAY® mark or any other mark, directly and indirectly, through employees, representatives, licensees, assigns, agents, and others, at wholesale, retail, and otherwise, at any location, without restriction by any right you may have, and without regard to the location of any SUBWAY® restaurant, and these other stores or methods of distribution may compete with the Restaurant and may adversely affect your sales. You do not have any right to exclude, control or impose conditions on the location or development of any SUBWAY® restaurant, other restaurant, store or other method of distribution, under the SUBWAY® mark or any other mark.

n. You acknowledge it is our intent to comply with anti-terrorism laws, including but not limited to the USA PATRIOT Act and Executive Order 13224 enacted by the United States Government and any such laws applicable in your country. You further acknowledge that we will not carry on business with anyone suspected as a terrorist or anyone otherwise associated directly or indirectly with terrorist activities. The parties agree that if, at any time during the term of this Agreement, we are prohibited from doing business with you under any anti-terrorism law applicable in your country or enacted by the US Government, then this Agreement may be terminated immediately in accordance with Subparagraph 8.c. You acknowledge that you are not now, and have never been a suspected terrorist or otherwise associated directly or indirectly with terrorist activity, including but not limited to, the contribution of funds to a terrorist organization. You further acknowledge that it is not your intent or purpose to purchase a SUBWAY® franchise to fund or participate in terrorist activities.

o. You authorize us, at any time during the term of this agreement, to conduct credit checks or investigative background search, on you which may reveal information about your business experience,

15

educational background, criminal record, civil judgments, property ownership, liens, association with other individuals, creditworthiness and job performance.

p. We and our Affiliates, and you and your Affiliates, will not withhold any money due to the other party and its Affiliates, under this Agreement or any other agreement. A party or its Affiliate that withholds money in violation of this provision will reimburse the party or its Affiliate whose money is withheld for the reasonable costs to collect the withheld money, notwithstanding the provisions of Subparagraph 10.a. These costs include, but are not limited to, mediation and arbitration fees, court costs, lawyers' fees, management preparation time, witness fees, and travel expenses incurred by the party or its Affiliate, or its agents or representatives.

**12. TERMS, LANGUAGE, REFERENCES AND HEADINGS.** All terms and words in this Agreement will be deemed to include the correct number, singular or plural, and the correct gender, masculine, feminine, or neuter, as the context or sense of this Agreement may require. This Agreement is in the English language, which language will control in all respects. No translation, if any, of this Agreement into any other language, will be given any force or effect to interpret this Agreement, unless required by the law of the country in which the Restaurant is located. Each individual signing this Agreement as the franchisee will be jointly and severally liable. References to "you" will include all such individuals collectively and individually. All references to monetary values in this Agreement are stated in Euros (€), the official currency of the European Union. The paragraph headings do not form part of this Agreement and shall not be taken into account in its construction or interpretation.

**13. GOVERNING LAW.** This Agreement will be governed by and construed in accordance with the substantive laws of Liechtenstein, without reference to its conflicts of law, except as may otherwise be provided in this Agreement. The parties acknowledge Licensor is located in Liechtenstein, and Licensor wants to achieve consistency in the interpretation and enforcement of this Agreement throughout the world. The parties acknowledge that to accomplish Licensor's goal, Licensor directs that we chose Liechtenstein law to govern our Franchise Agreements unless local law requires us to use local law. This Agreement, including the Recitals and all exhibits, contains the entire understanding of the parties and supersedes any prior written or oral understandings or agreements of the parties relating to the subject matter of this Agreement. The parties may not amend this Agreement orally, but only by a written agreement, except we and our Affiliates may amend the Operations Manual from time to time as provided in this Agreement. The provisions of this Agreement which by their terms are intended to survive the termination or expiration of this Agreement, including, but not limited to, Subparagraphs 5.c., 5.h., 5.k., 5.p., 8.d., 8.e., 8.g., 8.h., 11.b., 11.h., 11.i., and 11.m., and Paragraphs 10, 13, 14, 15, 16, 17, 18 and 19, will survive the termination or expiration of this Agreement.

**14. AMENDMENT TO PRIOR AGREEMENTS.** The parties want to encourage advertising cooperation and franchisee compliance, provide for amicable, timely, and cost effective resolution of Disputes with limitations on liability, and clarify certain provisions of existing Franchise Agreements. To achieve these goals, this Agreement has revised provisions regarding payment of taxes, costs and expenses, responsibility for employment practices and employees, insurance, indemnification, preauthorized account and letter of credit, reporting information electronically by personal computer based point-of-sale system, payments due following an audit, increasing advertising contributions, defaults and termination, dispute resolution, interest and late fees, no territorial rights and our unlimited right to compete, governing law, merger clause, continuing effect, and limitation of liability. You agree to accept the provisions set forth in <u>Subparagraph 5.b.</u>, <u>Subparagraph 5.c.</u>, <u>Subparagraph 5.e.</u>, <u>Subparagraph 5.f.</u>, <u>Subparagraph 5.g.</u>, <u>Subparagraph 5.h.</u>, <u>Subparagraph 5.i.</u>, <u>Subparagraph 5.o.</u>, <u>Paragraph 6</u>, <u>Paragraph 8</u>, <u>Paragraph 10</u>, <u>Subparagraph 11.f.</u>, <u>Subparagraph 11.m.</u>, <u>Subparagraph 11.n.</u>, <u>Subparagraph 11.o.</u>, <u>Paragraph 13</u>, and <u>Paragraph 18</u> in this Agreement, for this Agreement and to the amendment of all your other existing Franchise Agreements with us to include these provisions (if the existing Franchise Agreements do not already include these provisions). **EACH OF YOU SIGNING THIS AGREEMENT AS FRANCHISEE ACKNOWLEDGES AND UNDERSTANDS THAT THIS PARAGRAPH 14 AMENDS ALL YOUR EXISTING FRANCHISE AGREEMENTS WITH US, AND ANY SUCH AMENDMENT WILL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.** This Paragraph 14 amends any existing Franchise Agreement you have if every individual who signed the existing Franchise Agreement as franchisee signs this Agreement or another Franchise Agreement containing the provisions of this Paragraph 14.

**15. RESPONSIBILITY FOR TRANSLATIONS.** We and our Affiliates conduct business in English (as spoken in the United States of America). All communication and business between us and you will be in English, including, but not limited to, training programs, training materials, correspondence, contracts, transfer documents, sales literature, manuals, newsletters, specifications, reports, notices, and arbitration. Specifications, weights, and measures, are in the English Measure System. If we do not have a Development Agent assigned to the Restaurant, you will research local laws to determine if this Agreement and any related documents must be in the local language, or must use local specifications, weights, and measures. If local law requires, or if you feel it is necessary, you, at your sole cost, will obtain accurate translations of documents or conversions of specifications, weights, and measures, and provide copies to us. You will be responsible for the accuracy of any translation or conversion. If any portion of a translation or a conversion is not correct, that is, not identical in meaning to the English text or not equivalent to the English Measure System specification, weight, or measure, you will obtain a correction immediately. If we have already obtained translations, conversions, or corrections, you will reimburse us

for our expenses. The parties will sign English language versions of this Agreement and any related documents, in addition to any translations. Unless otherwise required by local law, the English version will control.

**16. NO OTHER REPRESENTATIONS.** You acknowledge no employee, agent, or representative of ours, or of Licensor, DAI, our other Affiliates, or our development agents, has made any representations to you, and you have not relied on any representations, except for the representations contained in this Agreement, the Offering Circular, and our advertising materials, and except those you have written in below:

_____
_____
_____
_____
_____

**17. NO PRIOR CLAIMS AND GENERAL RELEASE.** You represent that as of the date of this Agreement, you have no claims of any type against us, Licensor, DAI, our other Affiliates, or the Development Agent, or our agents, representatives, shareholders, directors, officers, and employees, or those of Licensor, DAI, our other Affiliates, and the Development Agent, except those you have written in below:

_____
_____
_____
_____
_____

You hereby release each of these individuals and entities from all claims other than those you listed above. You acknowledge and understand that any list of claims and the general release will include any alleged breaches of franchise or other laws, and any alleged breach of agreement, relating not only to this Agreement, but also to any agreements or dealings you may have or had at any time with us or any of the above listed individuals or entities.

**18. LIMITATIONS ON DAMAGES.**

a. The parties agree no party will be liable for special, incidental, consequential, or punitive damages, and no party will seek multiple forms of damages of any kind in any Dispute, except to the extent national or local law prohibits this limitation of damages or this Agreement otherwise permits. Each party's liability will be limited to compensatory damages, including claims for actual damages or losses and for lost future earnings or profits. Any claim for lost future earnings or profits will be limited to a maximum period of one (1) year. The parties specifically agree the provisions of this Subparagraph 18.a. will apply even if applicable governing law or arbitration rule permits an award for the type of damages the parties agree will not be available under this Agreement.

b. The parties further agree that a party's total liability for Disputes, as limited in Subparagraph 18.a., is further limited to an amount not greater than (1) €50,000, as adjusted annually for inflation in the country in which our principal office is located, at the end of each full calendar year as reported by official government sources if available, otherwise by any reasonably reliable source, or (2) the minimum amount in controversy necessary for federal diversity jurisdiction under 28 United States Code Section 1332; whichever yields the larger amount.

**19. CONSENT TO TERMS OF AGREEMENT.** You acknowledge you read and understand this Agreement, including any addenda and exhibits (including, but not limited to, any local language translations of Paragraphs 10, 11, and 18 we provided), and you agree to be bound by all of its terms and conditions.

IN WITNESS WHEREOF, the parties have executed this Agreement, as of the date first written above.

FRANCHISEE(S):
_____
Ornela Cere
Franchisee

SUBWAY INTERNATIONAL B.V.:
By: _____
Duly Authorized

Title: _____**DIRECTOR**_____

SIBV EURO 04/08

17

#45251

## MUTUAL RELEASE

AGREEMENT, dated 13 November 2008 between Subway International B.V. (SIBV) and Ornela Cere and Gligor Muka (SELLER).

FOR VALUABLE CONSIDERATION RECEIVED, the parties agree:

1. The Franchise Agreement executed by them dated 30 June 2008 (the "Agreement") for SUBWAY® Franchise #45251, located at no location, GREECE is hereby terminated.

2. Each party hereby releases the other and the other's affiliates, and the shareholders, directors, officers, employees and agents of the other and the other's affiliates, (including a release by SELLER in favor of SIBV's Development Agent servicing SELLER and his affiliates, and the shareholders, directors, officers, employees and agents of such Development Agent and his affiliates), from all claims each may have against the other of every kind and description whatsoever, whether in contract, tort, strict liability or statutory, that now exists or has accrued as of the date of this Release, arising out of or relating to the Agreement.

   Notwithstanding the foregoing, this Release does not affect any outstanding compliance matters or any continuing obligations of the parties under any other franchise agreements between the parties, or the obligations under the Agreement which by their terms or by implication are intended to survive the termination of the Agreement, including, but not limited to, any claim for indemnification and the nondisclosure and noncompetition restrictions on SELLER.

3. Unless the SELLER still has an operating SUBWAY® Franchise after the execution of this agreement, as to which this paragraph shall not apply, the SELLER agrees he shall comply with the provisions of Section 8g (which may have been subsequently modified by an Addendum) of his Franchise Agreement dated June 30, 2008. SELLER is also advised that the penalty for breach of this provision shall include any applicable gross receipts tax, sales tax, or other tax imposed on the person paying or receiving the payment.

4. Subway International B.V. (SIBV) and Ornela Cere agree that this Release will not apply in the event of any liability arising out of any audit or any review of the Seller's books and records for Subway ®Franchise #45251 which indicate an underreporting in sales in excess of two percent (2%) of total sales prior to the date of this Release.

This Agreement may be executed in one or more counterparts, any one of which need not contain the signature of more than one party and all of which taken together will constitute one and the same Agreement. This Agreement will become effective when fully executed and delivered to by all parties whether in one or more counterparts. Except for execution and delivery of this Agreement by all parties, there are no conditions precedent to the Agreement's becoming effective.

SELLER _____ Ornela Cere

Ornela Cere

_____
Elena Doula
Witness

_____
Maria Bournazou
Witness

_____
Gligor Muka
Gligor Muka

_____
Witness

_____
Vassilis Fokas
Witness

Subway International B.V.

_____ Patricia Demarais
Duly Authorized

**PATRICIA DEMARAIS
DIRECTOR**

STATE OF    CONNECTICUT           )
                                  ) SS: MILFORD
COUNTY OF   NEW HAVEN             )

    On this 21st day of November, 2008 before me personally came Patricia Demarais, to me known, who, by me duly sworn, did depose and say that deponent resides at Milford, Connecticut and who executed the foregoing Agreement, that deponent knows the seal of the corporation, that the seal affixed to the agreement is the corporate seal, that it was affixed by order of the Board of Directors of the corporation; and that deponent signed deponent's name by like order.

My Commission Expires:

        My Commission Expires
        October 31, 2013        _____
                                                        Notary Public


STATE OF    CONNECTICUT           )
                                  ) SS: MILFORD
COUNTY OF   NEW HAVEN             )

    On this _____ day of _____, 2008 before me personally came Patricia Demarais, to me known, who, by me duly sworn, did depose and say that deponent resides at Milford, Connecticut and who executed the foregoing Agreement, that deponent knows the seal of the corporation, that the seal affixed to the agreement is the corporate seal, that it was affixed by order of the Board of Directors of the corporation, and that deponent signed deponent's name by like order.

My Commission Expires:


                                                 _____
                                                          Notary Public

Franchise __#45251__

## NON-TRADITIONAL LOCATION RIDER - UNDER 50 UNITS

This Rider dated __November 13__, __2008__ amends and supplements the Franchise Agreement, including any provisions modified by a Satellite Rider, both of the same date and any Addenda to the Franchise Agreement (the "Franchise Agreement") between Subway International B.V., a Netherlands limited liability company ("we" or "us"), and __Ornela Cere__

_____ ("you"). The Franchise Agreement, as amended by this Rider, will be called this "Agreement".

The parties amend and supplement the Franchise Agreement as follows:

I.  Paragraph 2 is amended by adding the following at the end:

You may sell canned drinks, food, and sundry items in other areas of the Facility (as defined below) and revenue from these sales will not be included in gross sales. Coffee sales will only be included in gross sales if coffee is offered in SUBWAY® logoed cups or from behind the Restaurant counter area. Fountain drink sales will be included in accordance with your selection as follows:

Check either a., b., c. or d.:

____ a. You will include all fountain drink sales within the Restaurant area located at the Facility or sold in SUBWAY® logoed cups in gross sales. The Restaurant may either have a separate fountain or may share a common self-service fountain with the rest of the Facility you operate.

__✓__ b. You will include twenty-five percent (25%) of all fountain drink sales at the Facility in gross sales. You may only choose this option if you are currently offering fountain soda on your standard menu.

____ c. You will include the price of the average size soda sale at the Facility with twenty-five percent (25%) of all SUBWAY® sandwich and salad units sold. (For example: If you sell 100 units and the average price of a soda is €1.00, you will include the price of soda with 25 units. You will include €25.00 in gross sales as sales from fountain drinks, subject to Royalty and advertising charges.)

____ d. You will add an additional amount equal to thirteen percent (13%) of recorded gross sales of the Restaurant to arrive at "gross sales" for the purposes of this Agreement.

II.  Subparagraph 3.c. is amended by adding the following at the end:

References throughout this Agreement to the Restaurant solely apply to the SUBWAY® restaurant area and not to the rest of the facility you operate in which you establish the Restaurant (the "Facility"). This Agreement will only apply to your operation of the SUBWAY® Restaurant and not to your other businesses except to the extent that your other businesses may be in competition with the Restaurant.

III.  Subparagraph 5.a. is replaced in total by the following:

a.  In regards to the opening of the Restaurant:
(i) You will construct and equip the Restaurant to the specifications contained in the Operations Manual and open for business within one hundred eighty (180) days from the date of this Agreement or this Agreement will automatically expire at the end of the one hundred eighty (180) day period. If the building in which you will locate the Restaurant is not built on the date of this Agreement, we may grant in writing a one hundred eighty (180) day extension at your written request made before expiration of the one hundred eighty (180) day period. If you do not open the Restaurant by the end of the time permitted, including any extension, this Agreement will automatically expire.
(ii) The Restaurant will be at a location we approve in a portion of an existing Facility you own, lease, or otherwise control under a management agreement. Because you are providing the premises for the Restaurant, we do not require a Sublease. All references to the Sublease in this Agreement are deemed deleted. If we do not grant final approval for this location within ninety (90) days from the date of this Agreement, we may return the Franchise Fee you paid under Paragraph 1 and this Agreement will be null and void. We and you agree, subject to our final approval, the Restaurant will be located at:

1

_____SOUNIOS 94 ATHENS GREECE_____

If you sign a Satellite Rider in conjunction with this Rider, your Restaurant will be a:

Cart: __   Sandwich Unit: _____   Mobile Unit: _____   Other: _____

    (iii) Subject to our prior written approval, you or your designee will attend and successfully complete the training program we provide under Subparagraph 4.a., before you open the Restaurant. You or your designee may be dismissed from the training program and this Agreement may be terminated if you fail to act in a professional manner at all times during the training program in accordance with our Code of Business Conduct. Your Franchise Fee will not be refunded. You or your designee may be required to achieve a passing score on our standardized test conducted during the training program. You or designee will have the option to take one final retest. If you or your designee fail to achieve a passing score on both the test and final retest, we may dismiss you or your designee from the training program, cancel this Agreement and refund one-half (1/2) of your Franchise Fee. If more than one individual signs this Agreement, any one of the individuals who does not achieve a passing score on the test may be dismissed from the training program, removed from this Agreement and the Franchise Fee will not be refunded. We will not reimburse you for your travel expenses. In addition, you must send your manager for the Restaurant to training before you open the Restaurant. Your manager may be dismissed from the training program for failure to act in a professional manner at all times during the training program in accordance with our Code of Business Conduct. Your manager may be required to achieve a passing score on our standardized test conducted during the training program. The manager will have the option to take one final retest. Any manager failing to achieve a passing score on both the test and final retest will be dismissed from the training program. If the manager is dismissed from the training program, you must appoint an individual to replace the manager and to satisfy the requirements of the Subparagraph 5.a.(iii) within 30 days after we give you notice. We will not reimburse travel expenses incurred by you, your designee or your manager. If you replace the manager of the Restaurant, you must send the new manager to training before the new manager assumes the position of manager, or at least within thirty (30) days after the new manager replaces the prior manager, and the new manager must successfully complete training. You will pay all transportation, lodging, and other expenses any of your employees incur to attend our training program.

IV.    Subparagraph 5.c. is amended by adding the following at the end:

    In the event that your insurable interest in the facility in which the Restaurant is located is greater than the Restaurant, subject to our prior written approval, you may obtain insurance through your usual insurance broker or company provided that they can meet the required limits and they have a rating of at least A- in Bests' Insurance Guide.

V.    Subparagraph 5.d. is amended by adding the following after the first sentence:

    However, the preceding sentence does not apply to a Restaurant we designate as a non-traditional location. The following applies to non-traditional locations: You agree other areas of the Facility you or your Affiliates control will not sell "Sandwiches". The term "Sandwiches" is specifically defined to mean submarine, hoagie, wedge, or hero-type sandwiches. You understand you must offer the full SUBWAY® menu at the Restaurant in accordance with the Operations Manual. You may sell food products other than Sandwiches at the Facility and you may operate any non-Sandwich franchised or company-owned food unit. However, you will not sell any "Branded Sandwiches" (as defined below) or operate a Branded Sandwich food unit, franchised or company-owned, except as we permit in this subparagraph. You will give us the first opportunity to approve for a SUBWAY® restaurant location any site in which you want to operate a Branded Sandwich unit. You may only operate a Branded Sandwich unit that is not a SUBWAY® restaurant if we have, in writing, denied you approval to operate a SUBWAY® restaurant at the proposed site. If you operate a Sandwich unit that is not a Branded Sandwich unit, you must comply with Subparagraph 8.h. and you may not market the Sandwich unit concept as a franchise system or an independent chain. You will send a written request for approval of all proposed Branded Sandwich unit sites to our Development Team Department. We will respond within sixty (60) days, either approving or disapproving a location. The term "Branded Sandwiches" is defined to mean Sandwiches marketed under a locally, regionally, or nationally known or registered trade name or service mark, by a fast food franchise system or company-owned chain whose primary menu items consist of Sandwiches.

2

VI. Subparagraph 5.g. of the Franchise Agreement is amended to delete the second sentence and replace it with the following:

You will maintain, for three (3) years, all records of your operation of the Restaurant, including, but not limited to, cash register tapes, control sheets, weekly inventory sheets, sales and purchase records, and accounting records, at the Restaurant or the site where you store your records for the operation of the Facility. You will give us access to review and audit these records at the Restaurant or other site. We will give you notice of an audit at least five (5) business days prior to the audit.

VII. Paragraph 7 is amended by renumbering the existing Paragraph as Subparagraph 7.a., and by adding the following new Subparagraph 7.b.:

b. Notwithstanding the foregoing, we may, without cause and for any reason, within thirty (30) days after the date of this Agreement, cancel this Agreement and refund the Franchise Fee to you. After refunding the Franchise Fee to you, we will not have any further obligation to you, and all rights granted to you under this Agreement will immediately revert to us. In addition, provided you comply with the post-termination non-compete provisions of this Agreement, you may, at any time, terminate this Agreement and cease operation of the Restaurant after giving us thirty (30) days' prior written notice.

VIII. Subparagraph 8.g. is replaced in total by the following:

g. For one year after termination, expiration or transfer of this Agreement, or if you cease operation of the Restaurant, you will not directly or indirectly sell, or assist another to sell, Branded Sandwiches or operate a Branded Sandwich unit, franchised or company-owned, at the Facility. You agree to pay us €10,000 plus eight percent (8%) of the gross sales of the Branded Sandwiches or the Branded Sandwich unit, during the one (1) year period, as being a reasonable pre-estimate of the damages we will suffer. If you do, we may seek to enjoin your activities under Subparagraph 10.f.

The provisions of this Subparagraph 8.g. will not release you or the Entity Franchisee from any covenant not to compete contained in any other Franchise Agreement you or the Entity Franchisee have with us. Nothing in this subparagraph or any other provision of this Agreement grants you any territorial or other exclusive rights. We and our Affiliates have unlimited rights to compete with you as stated in Recital J, which is deemed repeated in this subparagraph.

IX. Subparagraph 8.h. is amended by adding the following after the third sentence of the subparagraph ["You will not, during or after the term of this Agreement"]:

You specifically agree, except as a SUBWAY® franchisee operating pursuant to a valid Franchise Agreement, you will not do the following:

1. Use our recipes, formulas, food preparation procedures, business methods, business forms, or business policies, either as stated in the Operations Manual or as specifically developed and approved for use at facilities such as those you operate.

2. Offer for sale any Sandwiches which are nine inches (9") or more in length, except at a Branded Sandwich unit permitted under Subparagraph 5.d.

3. Use the word or prefix "SUB", by itself or as part of another word, in any name of the unit you operate, except at a Branded Sandwich unit permitted under subparagraph 5.d.

4. Copy our menu, including, but not limited to, specialty sandwich names and offerings. You will not offer more than four (4) of the same condiments or four (4) of the same vegetable choices listed on our menu. Also, you will not sequence the Sandwich's components in the same order as we do.

5. Copy or otherwise use our look and style, which includes, but is not limited to, our trade dress, decor, formats for store design, colors, advertising promotions, and marketing concepts.

X. The Franchise Agreement, as amended and supplemented by this Rider, contains the entire understanding of the parties. The parties can amend the Franchise Agreement further only in a signed writing. The provisions of the Franchise Agreement, as amended and supplemented by this Rider, are ratified and affirmed.

3

XI.     You acknowledge you read and understand this Rider and the Franchise Agreement, and consent to be bound by all the terms and conditions of the Franchise Agreement, as amended and supplemented by this Rider.

**IN WITNESS WHEREOF**, the parties have executed this Rider, as of the date first written above.

FRANCHISEE(S):                                              SUBWAY INTERNATIONAL B.V.

_____                             By _____
            Franchisee                                      Title: _____ **DIRECTOR**

_____
            Franchisee

_____
            Franchisee

SIBV Under 50 Rider EURO 04/08

4

Franchise #45251

## EUROPEAN UNION RIDER

This Rider dated __November 13__, 2008 amends and supplements the Franchise Agreement of the same date (the "Franchise Agreement") and all other existing Franchise Agreements, if any, (collectively referred to as the "Franchise Agreement") between Subway International B.V., a Netherlands limited liability company ("we" or "us"), and Ornela Cere ("you"). The Franchise Agreement, as amended by this Rider, will be called this "Agreement". Capitalized terms used in this Rider that are defined in the Franchise Agreement will have the meanings given to them in the Franchise Agreement.

*RECITALS*

R.1. The Restaurant will be located in a nation that is a member of the European Union/European Community.

R.2. The parties want the Franchise Agreement to comply with the requirements of the Vertical Block Exemption as set forth in EEC Commission Regulation No EC2790/1999 dated December 22, 1999, as it may be amended (the "Vertical Block Exemption"). The parties are signing this Rider specifically to modify the Franchise Agreement to qualify for the Vertical Block Exemption.

*AGREEMENT*

Acknowledging the above Recitals, which are deemed to be a part of the Franchise Agreement and are added to the Recitals in the Franchise Agreement, the parties amend and supplement the Franchise Agreement as follows:

I.  Subparagraph 5.b.(ii) of the Franchise Agreement is amended by adding the following at the end:

Nothing in this Agreement or in the Operations Manual will restrict you, directly or indirectly, from determining the sale prices for the goods or services which are the subject-matter of this franchise. We may suggest sale prices, which you may consider, but you do not have to adhere to the suggested sale prices.

Nothing in this Agreement or in the Operations Manual will oblige you not to supply within the common market the goods or services which are the subject matter of this franchise to consumers because of their place of residence.

We may enforce your obligation under this Agreement or the Operations Manual, to sell, or use in the course of providing services, either (1) goods matching minimum objective quality specifications we laid down, or (2) goods which only we or approved third parties manufacture, but only to the extent necessary to protect our industrial or intellectual property rights or to maintain the common identity and reputation of the franchised network. Notwithstanding any other provision of this Agreement or of the Operations Manual, we may enforce your obligation to sell or use in the course of providing services, goods which only we or approved third parties manufacture, but only to the extent necessary to protect our industrial or intellectual property rights or to maintain the common identity and reputation of the franchised network, and only where it is impracticable, owing to the nature of the goods, to apply objective quality specifications. We will provide procedures in the Operations Manual to permit you to seek approval to obtain supplies of a quality equivalent to those offered by or approved by us, or manufactured by us or by approved third parties. We may grant or withhold our approval, subject to the above limitations. You will be free to obtain the goods that are the subject matter of the franchise, provided they meet the foregoing specifications, from other franchisees and from authorized distributors, if the goods are also distributed through a network of authorized distributors, notwithstanding any contrary provision in this Agreement or in the Operations Manual.

II. Subparagraph 5.d. of the Franchise Agreement is replaced in total by the following:

d. You will not own or operate, nor will you assist another to own or operate, any other business anywhere, directly or indirectly, during the term of this Agreement, identical with or similar to the business reasonably contemplated by this Agreement, in a territory where it would

1

compete with a member of the franchised network, including us, except as a duly licensed franchisee at a location we approve. A similar business within a radius of three (3) miles/ five (5) kilometers of an existing SUBWAY® restaurant will create a presumption of a breach of this restriction. To the fullest extent permitted by the Vertical Block Exemption, your acquisition of a financial interest in the capital of a competing undertaking as described in Subparagraph 8.g. below, will be deemed engaging in business under this Subparagraph 5.d. You agree to pay us €10,000, for each business you own or operate in violation of this Subparagraph, plus eight percent (8%) of its gross sales, as being a reasonable pre-estimate of the damages we will suffer. We may also seek to enjoin your activities under Subparagraph 10.f. We may enforce this Subparagraph 5.d. only to the extent necessary to protect our industrial or intellectual property rights or to maintain the common identity and reputation of the franchised network. Nothing in this Subparagraph or any other provision of this Agreement grants you any territorial or other exclusive rights.

III. q.: Paragraph 5 of the Franchise Agreement is amended by adding the following new Subparagraph q.:

q. You will honor any guarantees for goods we produce or third parties produce according to our instructions, and/or bearing our name or trademark in respect of such goods you supply or any member of the franchised network or other distributors supply which give a similar guarantee, in the common market, if we oblige you to honor guarantees for our goods.

IV. Subparagraph 8.g. of the Franchise Agreement is replaced in total by the following:

g. For one year after termination, expiration or transfer of this Agreement, you will not directly or indirectly engage in, or assist another to engage in, any sandwich business (other than another duly licensed SUBWAY® restaurant) on the premises which your franchise operated. You agree to pay us €10,000 for each sandwich business you are associated with that is located on the premises which your franchise was operated in violation of this Subparagraph, plus eight percent (8%) of the gross sales of such business during the one (1) year period, as being a reasonable pre estimate of the damages we will suffer. We may also seek to enjoin your activities under Subparagraph 10.f. Nothing in this Subparagraph or any other provision of this Agreement grants you any territorial or other exclusive rights.

V. Subparagraph 8.h. of the Franchise Agreement is amended by adding the following at the end:

Notwithstanding the provisions of this Subparagraph 8.h., or Subparagraph 5.b., or any other provision of this Agreement or of the Operations Manual to the contrary, we will not prevent you from continuing to use the licensed know-how after this Agreement terminates or expires where the know-how has become generally known or easily accessible, other than by your breach of any obligation.

VI. e.: Paragraph 9 of the Franchise Agreement is amended by adding the following new Subparagraph e.:

e. If the Vertical Block Exemption does not permit one or more of the above conditions for our approval to a transfer of the franchise, including but not limited to the right of first refusal you grant us under Subparagraph 9.a., then such condition or conditions will be null and void and deleted from this Agreement.

VII. Subparagraph 11.g. of the Franchise Agreement is amended by adding the following at the end:

Notwithstanding any provision of this Agreement or of the Operations Manual to the contrary, you are not prohibited from challenging the validity of the industrial or intellectual property rights which form part of the franchise. However, if you do challenge our industrial or intellectual property rights, our right to possibly terminate this Agreement will not be prejudiced by the preceding sentence.

VIII. Paragraph 13 of the Franchise Agreement is amended by adding the following at the end:

The parties agree this Agreement will be construed to the maximum extent possible to comply with the requirements of the Vertical Block Exemption, as provided in the European Union Rider (the "EU Rider"). We and you agree if we or you later believe or determine this

Agreement fails to meet the requirements of the Vertical Block Exemption or any other EC regulation with regard to this topic, we and you will negotiate in good faith to further modify this Agreement to obtain the benefit of the Vertical Block Exemption or any other applicable EC regulation. If the Restaurant is a satellite or is in another non-traditional location, and the parties enter into one or more riders to this Agreement with respect to the non-traditional location, then the various other riders will be interpreted to the fullest extent possible to be consistent with the EU Rider, but to the extent of any inconsistencies (for example, with respect to noncompetition covenants, and our right of first refusal to establish a restaurant in a proposed location), the provisions of the EU Rider will govern.

IX. The Franchise Agreement, as amended and supplemented by this Rider, contains the entire understanding of the parties. The parties can amend the Franchise Agreement further only in a signed writing. The provisions of the Franchise Agreement, as amended and supplemented by this Rider, are ratified and affirmed.

X. You acknowledge you read and understand this Rider and the Franchise Agreement, and consent to be bound by all the terms and conditions of the Franchise Agreement, as amended and supplemented by this Rider.

**IN WITNESS WHEREOF,** the parties have executed this Rider, as of the date first written above.

FRANCHISEE(S):

_____
Ornela Cere
Franchisee

SUBWAY INTERNATIONAL B.V.

By: _____
Duly Authorized

Title: _____ **DIRECTOR**

SIBV Euro EU Rider 04/08

3