Exhibit B

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 50 114 T 00477 09
　　SUBWAY International BV
　　vs
　　Ornela Cere,
　　Subway Restaurant # 45251

FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement provided in the Franchise Agreement between Subway International BV, the Claimant and Counterclaim Respondent ("SBIV" or "Claimant"), and Ornela Cere ("Respondent" or "Ms. Cere"), dated November 13, 2008 with reference to Subway store number 45251(the "Franchise Agreement'), having been duly sworn, and having duly reviewed the written submissions and exhibits of all parties, represented through their counsel, and having duly considered the proofs and allegations and testimony of Claimant and Respondent at a hearing on the merits, do hereby order, adjudge and award as follows:

### I.  Procedural History

Claimant filed its Demand on or about September 3, 2010. Respondent filed her Statement of Defense and Counterclaims on or about October 13, 2010. An Amended Demand was filed by Claimant on or about November 6, 2010.

A question as to the governing substantive law was raised by the Respondent and considered by the Tribunal after full briefing by the parties. Based on the choice of law clause in the Franchise Agreement which identified Lichtenstein law as the governing substantive law, the rationale and basis for that choice of law, the affidavits submitted by Lichtenstein and Greek counsel which opined that Lichtenstein law would be applied, the law in New York cited by the parties, as well

1

as the other factors stated in the Tribunal's Pre-Hearing Order #2 dated December 23, 2009 the Tribunal ruled that the substantive law of Lichtenstein was applicable to this proceeding.

The hearing was held on March 22, 23, 25 and 26, 2010 in New York City. No objection was raised by any party to the conduct of the arbitration in New York City as provided in the Franchise Agreement. Jurisdiction over this matter was accorded to this Tribunal pursuant to the Franchise Agreement and no objection was made to this Tribunal's jurisdiction. The arbitration proceeding was conducted pursuant to the terms of the Franchise Agreement in accordance with the United States Commission on International Trade Regulations and Law (UNCITRAL) Arbitration Rules.

The parties were represented by counsel: Claimant was represented by Kristin Corcoran and Respondents were represented by Angie Manolis.

### II. The Hearing and the Evidence

Claimant presented as witnesses Birgul Cetintas, the SBIV Area Development Manager supporting Subway in a number of countries including Greece; Linda Morse, a Subway collections supervisor; Gina Badalamenti, Subway's IFAF administrator; and Diane Pasacreta, a Subway employee in the legal standards group. SBIV also submitted the affidavit of Antonios Peridis, a Subway franchisee in the Greek Islands and the Development Agent for Athens as of the spring of 2009, who was made available for cross examination.

Respondent presented as witnesses Respondent Ornela Cere, Panayota Bletas, the Devlopment Agent for Athens and a former Subway franchisee in Athens and Dorotheos Mafidis, a former Subway franchisee in Athens. Respondent also presented the affidavits of Gledianna Poci, a former Subway store employee in Athens, Angela Bitzoli, a former Subway store employee in Athens, Makis Limberopoulos, a local Athens businessman, George Pallis, a prospective Subway franchisee, Annisa Liapaj, a former Subway store employee in Athens, Petros Saribelas, a Greek businessman engaged in PR and marketing, Loukis Kavalieratos, a local businessman, Konstatinos Konstandopoulos, a Reverend and former Subway store customer in Athens, Evmorfoula Muka, part owner of a Subway franchise in Athens, Victoria Victorova, a businesswoman with a store neighboring a former Subway store in Athens, Antonia Bleta, a

2

former Subway store employee in Athens, Anna Remoundou, a former Subway store employee in Athens, Angelos Ougiaridis, a Greek businessman and supplier of food, all available for cross examination.

Claimant also presented as a witness Nicholas Reithner, a Lichtenstein attorney with the firm of Walch & Schurti, who submitted statements with respect to Lichtenstein law dated April 13, 2000, March 10, 2010 and April 23, 2010. Respondent's counsel stated that "they were satisfied with Mr. Reithner's legal opinions of the case" and did not submit evidence on Lichtenstein law. E-mail from Respondents' counsel, May 12, 2010.

### III. The Claims Asserted

**SBIV's Claims**

SBIV claims that the Franchise Agreement provides for the payment of royalties equal to 8% of gross sales and that royalties from Respondent in the amount of 765.25 Euros are due. Claimant's Pre-Hrg. Memo at 1. Claimant further asserts that the Franchise Agreement requires payment into an advertising fund and that advertising fees in the amount of 315.31 Euros are owed to it by Respondent. Claimant's Pre-Hrg. Memo at 1. Respondent do not dispute the amounts claimed to be owed for royalties and advertising fees but denies her liability to pay such sums on the grounds that her counterclaim is in excess of that sum. Hearing Tr. at 1562-1563.

SBIV further claims that after Respondent ceased operating as a Subway store she failed to properly disidentify the store and continued to sell sandwiches from the location of the former Subway store in violation the Franchise Agreement. Accordingly, Claimant asserts entitlement to damages in the amount of 11,119.85 Euros, Ex. C-25, pursuant to the terms of the Franchise Agreement. Respondent denies this allegation.

SBIV seeks:

a. Confirmation that the Franchise Agreement is terminated.

b. Payment of the outstanding royalties in the amount of 765.25 Euros

c. Payment of advertising fees in the amount of 315.31 Euros

3

d. An order that Respondent cease selling sandwiches in violation of the Franchise Agreement from the former Subway store location

e. Damages in the amount of 11,119.85 Euros for Respondent's failure to disidentify the store and for continuing to sell sandwiches in violation of the Franchise Agreement

f. Attorney's fees and costs

**Respondents' Claims**

At the Tribunal's request Respondent identified the following provisions of the Franchise Agreement that she claims had been breached:

a.  Paragraph 5(a) (3) relating to the lease for the store location

b.  Paragraph 5 (i) relating to advertising funds

c.  Paragraph 5(m) relating to food sources

d.  Paragraph 11 (k) relating to tax documents

e.  Paragraph 8(a) (ii) relating to termination of the franchise


Respondent makes the following claims in their Counterclaim:

1.Claimant failed to provide the documentation required by the Greek taxing authorities that would allow Respondent to make payments called for under the Franchise Agreement to Claimant. Counterclaim §§ 5 (d), 6-8, 13.

2.  Claimant failed to promote the Subway brand in the local market. Counterclaim § 9.

3. Claimant failed to record advertising funds available in the market. Counterclaim § 11-12.

4. Claimant did not act in good faith in terminating the Franchise Agreement. Counterclaim § 14-16.

4

5. Claimant obligated Respondents to purchase products and supplies from one approved vendor at expensive costs and failed to consent to and identify additional sources of supply who could provide Subway quality products at cheaper prices. Counterclaim § 17.

6. Claimant failed to advise Respondent that it was in litigation with SFAFT. Counterclaim § 18.

7. Respondents entered into the Franchise Agreement based on a mistake of fact and negligent statements made by Claimant. Counterclaim § 21.

Respondent seeks damages in the amount of 895,276.08 Euros for building costs, rent, losses and projected future gains, royalties and advertising fees paid, utilities, insurance debts, cleaning supplies, vendor costs and lost subsidy from the Women's Initiative. Respondent also seeks attorney's fees and costs. Respondent's Post-Hrg. Mem.¶ 2.

### IV. BACKGROUND

**The Parties**

SBIV is a limited liability company in the Netherlands. SBIV is a franchisor with over 30,000 Subway stores in operation in 87 countries as of 2008.

Ornela Cere is a resident of Athens (or Attiki), Greece. Her mother wanted to open a Greek café with coffee and pies  but her uncle who lived in America suggested that Respondent open a franchise instead telling her that if she picked a big franchise it would be successful. Cere Tr. at 604.[1] Respondent first entered into a franchise agreement with SBIV on June 30, 2008 with her uncle. He subsequently chose to withdraw and Respondent signed the second and operative Franchise Agreement, Ex. C-1, on November 13, 2008. Respondent's store was a "non-traditional store" which allowed the store to sell non-Subway products subject to certain requirements. Respondent obtained the right to be a Subway franchisee and have rights to the Subway System and Subway trade name.

Respondent operated Subway store number  45251 from on or about November 27, 2008 until August 31, 2009 as a franchisee under the Franchise Agreement. Respondent's store was located

---

[1] References to the hearing transcript list the name of the witness followed by the term "Tr." and the page number.

in Athens (or Attica), Greece. Panayota Bletas and John Bletas were the Development Agents for SBIV for the Athens market responsible, among other things, for developing the market, assisting the franchisees, conducting their monthly evaluation, helping them organize transportation logistics, and finding sources of supply. Birgul Centitas was the Area Development Manager responsible for Greece and several other countries in the area including Bulgaria and Turkey.

**The SBIV Franchise Agreement Process**

SBIV takes great pains to ensure that its franchisees carefully consider their decision to enter into the franchise relationship and fully understand the obligations and commitments of all of the parties before they sign the Franchise Agreement. Prospective franchisees are given a comprehensive offering circular (the "Offering Circular"), Hearing Ex. C-50, which encourages prospective franchisees to read the contract carefully and to consult with an advisor, lawyer or accountant. A prospective franchisee cannot enter into a franchise agreement unless at least 10 days have elapsed after the delivery of the offering circular or unless 10 days have elapsed from the date of delivery of the offering circular before payment to SBIV, thus assuring a time for reflection and serious consideration before a decision is made.

SBIV takes steps to ensure that prospective franchisees understand the terms of the franchise agreement and the respective obligations of SBIV and the franchisee and to ensure that prospective franchisees are not relying in entering into the franchise on any statement or promises made or understood to have been made by any SBIV representative different from what is set forth set forth in the written documents.

SBIV asks at the same time as the Franchise Agreement is executed, that the franchisee complete and execute a Franchise Disclosure Questionnaire so that it can be certain that all of the information disclosed to the franchisee is understood, clear and accepted. Centintas Tr. at 411-412. Thus the franchisee, as part of the process of starting a franchise, is asked to review the Disclosure Questionnaire and reflect his or her understanding of the contract terms, including those that might be viewed as surprising or unfavorable to the franchisee.   Franchisees understood that the reason for the Disclosure Questionnaire was to make sure the franchisee

6

understood the franchise agreement. Mafidis Tr. at 1073-1074. The Disclosure Questionnaire is not a contract, creates no contractual obligations and does not cause the franchisee to waive any rights,[2] but pursuant to Lichtenstein law, the specific clauses of the Franchise Agreement and the Offering Circular highlighted in the Disclosure Questionnaire are binding on the parties, even if they are in any way uncommon and would not otherwise be expected by a SBIV franchisee. Reithner Statement April 23, 2010. ¶¶3-11.

The franchisee in signing the Franchise Agreement makes the following representation:

> "You represent you understand the risks of owning a business and specifically the risks of owning a Subway store, and you are able to bear such risks. You acknowledge the success of the Restaurant will depend primarily on your own efforts and abilities…You also acknowledge other factors beyond your control will affect the Restaurant's success, including but not limited to competition, demographic patterns, consumer trends, interest rates, economic conditions, government policies, weather, local laws, rules and regulations, legal claims, inflation, labor costs, lease terms, market conditions, and other conditions that may be difficult to anticipate, assess or even identify… You recognize that some Subway restaurants have failed and more will fail in the future. You understand that your success will depend substantially on the location you choose. You acknowledge our approval of the location of the Restaurant does not guarantee the Restaurant's success at that location and the Restaurant may lose money or fail."

Ex. C-1 Recital I. Ms. Cere in signing the Franchise Agreement made that representation to SBIV.

The Disclosure Questionnaire asks a series of questions to confirm that the franchisee had understood the Offering Circular and the Franchise Agreement. These questions include whether they received and personally read and understood the Offering Circular and the Franchise Agreement, whether they discussed the risks with their professional advisor, whether they understood the risks of operating a Subway store, whether they understood that any claims must be arbitrated in New York, whether they understood that "the success or failure of your franchise will depend in large part on your skills abilities and efforts… as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace."

---

[2] By its nature, the Disclosure Questionnaire does not constitute a waiver of any rights. This was confirmed by Mr. Reithner under Lichtenstein law. Reithner Statement April 23, 2010 ¶ (B)(1)

The Disclosure Questionnaire also reviews what a prospective franchisee is relying on in entering into the franchise and asks:

> "Is it true no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected earnings, the likelihood of success, the amount of money you may earn, or the total revenue a Subway franchise will generate, that is not contained in the Offering Circular or is contrary to, or different from the information contained in the offering circular?"

The Disclosure Questionnaire concludes with the following statement by the franchisee as to the truthfulness of the responses made:

> "You understand and agree that your answers are important to us and that we will rely on them. By sending this questionnaire, you are representing that you have considered each question carefully and responded truthfully to the above questions."

Ms. Cere signed and delivered the Disclosure Questionnaire to SBIV twice, once in connection with each franchise agreement, making this representation upon which SBIV relied. Ex. C-4 and C-5.

**The Environment for the Subway stores in Athens**

In 2008 and 2009 the global economy, and Greece in particular was in the midst of a deep recession. Indeed Ms. Bletas repeatedly listed the recession as one of the main reasons for the lack of success of Subway in Athens.

In addition to the difficulties posed by the recession, civil unrest overtook Athens. Just a few days after Respondent opened her store on November 27, 2008 riots started in Athens and terrorists were smashing everything right next to Respondent's Subway store. Kavalieratos Affidavit. Respondent's store, located near the university, was bombarded and Molotov cocktails were thrown in front of the store every day. Id. The riots took place not only outside the store but even inside the store. Cere Tr. at 888-889. The riots in Athens continued straight through until at least March of 2009. As Ms. Cere wrote on March 16, 2009: "We are in a very difficult situation, day by day we have hooligangs and attacks around us and the customers are afraid they are not coming down to the center, to shops. Ex. R-X12.

8

Apart from these very unfavorable conditions, Athens franchisees faced very high fixed costs for rent and electricity. The average local monthly wages were only 700 Euros per month. An inability to source food from Greek suppliers caused food supplies to be expensive with the high transportation costs that were incurred. These factors made the Subway offerings expensive for the local consumers. Moreover, as a new market there was little recognition of the Subway brand. The combination of these factors created a very difficult setting for Respondent's Subway store in Athens.

### V. SBIV's Claims

SBIV claims that pursuant to the Franchise Agreement royalties from Respondent in the amount of 765.25 Euros are due and that advertising fees in the amount of 315.31 Euros are owed to it by Respondent. Claimant's Pre-Hrg. Memo at 1. As noted above, Respondent does not dispute the amounts claimed to be owed for royalties and advertising fees but denies her liability to pay such sum on the grounds that her counterclaim is in excess of that sum. Hearing Tr. at 1562-1563. Accordingly, Claimant's claim for royalties and advertising fees is granted subject to netting any amounts found to be meritorious on the counterclaims.

Claimant claims that Respondent should be liable for 11,119.85 Euros for failure to properly disidentify her store and for selling sandwiches in violation of the Franchise Agreement after she ceased operating as a Subway store. The Tribunal has reviewed the evidence as to the Respondent's cafe and the products sold in the café after the termination of the relationship with SBIV and finds that the Claimant has failed to prove its assertion. There was confusion and doubt cast over where and when the pictures offered by Claimant in support of its position were taken rendering them unreliable. Claimant's demand for damages and relief based on Respondent's alleged failure to disidentify and for selling competing sandwiches in breach of the Franchise Agreement is denied.

### VI. Respondent's Counterclaims

#### Counterclaim relating to the store lease

Respondent claims that SBIV breached ¶ 5(a) (3) of the Franchise Agreement which provides:

9

> "the Restaurant will be at a location found by you and approved by us. We and an affiliate will lease the premises and enter into a Sublease or in limited circumstances a license for the Restaurant ("sublease') with you. We or our designee will attempt to secure a fair rent for the premises but we cannot represent it will be the best available rent in the area..."

This clause of the agreement applies in situations in which SBIV leases the space and subleases it to the franchisees. The clause is not applicable because Respondent leased the space directly herself as permitted under ¶ 5(a) (4) of the Franchise Agreement. It is that clause that is applicable here and Respondent makes no claim under that clause.  In any event, even under ¶5 (a) (3) SBIV makes no representation that the best rent will be achieved for the area. Respondent asserts that in the spring 2009 Mr. Peridis, who took over from Ms. Bletas as the Development Agent for Athens, said that he would attempt to reduce the rent.  But there was no proof submitted that a lower rent could have been negotiated for Respondent's facility and no damage can be said to have flowed from any such offer of assistance. As there is no evidence that Respondent suffered any damage as a result of the asserted fact, under Lichtenstein law, as is the law elsewhere, there can be no recovery. Reithner Statement March 10, 2010 § III.

The Tribunal finds that Respondent's claim with respect to the lease for the store must be denied and there was no breach of ¶ 5(a) (3) of the Franchise Agreement.

**Counterclaims Related to Advertising**

Respondent's claim that SBIV breached ¶ 5(i) of the Franchise Agreement which provides in part:

> " you will pay weekly into the Subway Franchisee Advertising (SFAFT) 3.5 % of gross sales of the restaurant until the franchisees in your country approve a permanent increase of the advertising percentage to 4.5 % by a 2/3 vote on the basis of one (1) vote for each operating restaurant. Signing this Agreement is your vote for the restaurant and under paragraph 14, for all restaurants you own to permanently increase the advertising percentage to 4.5%...

Respondent asserts that two thirds of the franchisees in the market had not approved the increase to 4.5% and that the franchisees were misled in the regular reports on advertising fees sent by Subway to its franchisees into thinking the 3.5% figure was being applied. Ms. Balamenti of SIBV testified that the increase to 4.5% had been approved. The evidence supports Ms.

10

Balamenti's testimony but since Respondent and the other Athens franchisees were in fact only charged the 3.5% until the conclusion of the relationship in August of 2009 the matter need not be resolved. See Ex C-17. Respondent recognizes that the 3.5% fee was required so there is no viable claim of wrongdoing by Subway in this regard. The Tribunal finds that there was no breach of ¶ 5(i) of the Franchise Agreement.

Respondent further claims that upon the transfer of the advertising funds and the transfer of administration of those funds from the International Franchise Advertising Fund ("IFAF") to Subway Franchise Advertising Fund Trust ("SFAFT"), no advertising funds could be found for a time. Respondent relies on the fact that a payment was made on an Athens market advertising invoice even though the market showed a negative balance at the time as proof that funds existed and should have been reflected in the monthly statements.

The Tribunal is not persuaded. Respondents were sent monthly statements of the advertising funds. If funds were missing that had previously been paid and available, it should have been a simple matter for Respondent to prove the discrepancy through the documents they received from SBIV. They did not do so. The Tribunal does not find a payment on an invoice when the account was negative to be probative that there were funds in the account. Ms. Balamenti's explanation that it was simply a mistake in accounting is more credible and is accepted by the Tribunal. Moreover, no damage to Respondents was shown to flow from any loss, whether or not temporary, of a recording of sums in these accounts which given the size of the advertising accounts would have only been only two or three thousand Euros in any event.

Respondent further complains that SBIV did not itself invest sufficiently in advertising in the Greek market. Indeed, this appears to be one of Respondent's principal complaints about SBIV's conduct. Respondent does not identify any document or statement that evidences a promise or commitment by SBIV to itself invest in advertising in the Greek market. Indeed the Offering Circular specifically provides that: "Neither we [SBIV] nor SFAFT is obligated to advertise in the area where you locate your franchise." Hearing Ex. C-50 at p. 58. Respondent confirmed in the Franchise Disclosure Questionnaire that no one on behalf of SBIV "had made any statement or promise or agreement, other than as these matters addressed in your Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training,

11

support services or assistance that is contrary to or different from the information contained in the Offering Circular." Ex. C-2 ¶19. Thus Respondent acknowledged that she understood that Subway itself made no commitment to pay for advertising, an understanding confirmed by her Development Agent Ms. Bletas at the hearing. Bletas Tr. 1425-1427.

SBIV did participate and pay for certain local advertising which it was not contractually obligated to do in order to support the Greek market. However, Respondent's main complaint on advertising seems to be that Claimant did not pay for television advertising in Greece. The Greek franchisees were at liberty to pay for television advertising out of the advertising funds they controlled. SBIV did not recommend television advertising in emerging countries like Greece as the cost of television advertising is high and with only a few stores in place a customer seeing the ad would not have a Subway store in his or her vicinity to patronize. Local advertising was recommended by Subway for emerging markets.  Nowhere does Respondent point to any commitment by SBIV to pay for television advertising. Absent the identification of a promise or commitment to itself pay for advertising in the Greek market, SBIV cannot be held liable for a failure to do so.

The Tribunal finds that Respondent's counterclaims related to advertising must be denied and there was no breach of ¶5(i) of the Franchise Agreement.

**Counterclaims Relating to Tax Withholding Documents**

Respondent devoted considerable attention to the subject of delays by SBIV in sending them certain tax withholding forms required by the Greek taxing authorities before Respondent could make payments to SBIV. Respondent claims that SBIV's conduct was in violation of ¶11(k) of the Franchise Agreement which provides that the parties would cooperate to furnish any documents required by the taxing authorities to establish the tax withholding.

SBIV did not send these forms in the first month of the year, but sent them a few months later. For example in 2009 the form was sent out in May. The evidence does not support a finding that the delay in the timing of sending the forms by SBIV caused any damages to Respondent. Respondent could always put the money aside and make payment to SBIV after the forms were received. Morse Tr. 280 - 281. As there is no evidence that Respondent suffered any damage or

12

prejudice as a result of the delay in receiving the tax forms from SBIV there can be no recovery for such act.

The Tribunal finds that since Claimant did send out the required tax forms there was no breach of the ¶ 11(k) Franchise Agreement.

**Counterclaim Relating to Bad Faith Termination**

Respondent claims that SBIV did not act in good faith in sending out a termination notice for non-compliance with the Subway operations manual. Respondent asserts that Claimant by so doing violated ¶ 8(a) (ii) of the Franchise Agreement which deals with the termination of dealers. Upon the conclusion of Ms. Bletas' role as the Development Agent for Athens, Mr. Peridis took over and was responsible for the store evaluations at Respondent's store.  SBIV has the local development agents conduct an evaluation on a monthly basis at all of its Subway locations, to ensure quality, health and safety.  Respondent took issue with the reports that the store was not in compliance on several items. The reports, which cited problems that affected health and safety, triggered an automatic termination notice from SBIV dated July 31, 2009 identifying the problems and citing the 60 day cure period available to Respondent. Ex. C-15.

Respondent complained and SBIV took steps to satisfy her concerns. An immediate correction was recorded to the erroneous marking of the store for being out of compliance for selling non-Subway products and SBIV arranged to have Ms. Cetintas do the store evaluation in September and thereafter. SBIV offered Respondent the opportunity to have the store evaluation done with a video recording and to have an ombudsman review the evaluations. Ex. R-L13.

Respondent chose not to accept any of SBIV's various proposals to address her complaints but rather decided to close her  Subway store.  Respondent asked for and completed a Store Closing Request Form. Respondent thus by her own choice ceased operating in Athens as a Subway store as of August 31, 2009.  No damages can be said to flow from a termination notice which Respondent had opportunities to cure with reasonable steps, as would be required as a mitigation measure, Reithner Statement March 20, 2010,¶ I, and which she chose not to pursue.

The Tribunal finds that there was no breach of § 8(a) (ii) of the Franchise Agreement or recoverable damages in connection with the termination notice.

13

**Counterclaims Relating to Product Supply**

Respondent contends that SBIV breached ¶ 5 (m) of the Franchise Agreement, quoted below, which deals with the sourcing of the food and equipment required to run a Subway store. Respondent make three claims with respect to product supply. First, Respondent claims that she was obligated to purchase from a single source which was extremely expensive and which required very high transportation costs. Second, Respondent claims that SBIV failed to approve local Greek suppliers of products. Third, Respondent claims that SBIV failed to approve delivery of products from Greece's neighbor, Bulgaria.

These claims must be reviewed having in mind the nature of the franchise system and the facts relating to the Greek market. As a franchise operation, SBIV appropriately has great concern about the quality, consistency and safety of the Subway products sold in Subway stores. The very nature of any franchise system depends on the maintenance of quality product and presentation consistent with the brand as well as the assurance of safety throughout the entire systems of stores. Pasacreta Tr. 498-500. In addition, the Greek market presented particular challenges. As a large tourist destination, many of the Greek Subway customers were accustomed to "100% gold standard", SBIV's designation for products 100% consistent with its standards and specifications. The Greek market was also challenging because of the logistical issues presented by the need to deliver to the Greek islands where several of the Subway stores were located and to assure the safe delivery of product to those islands where the temperatures were often extremely high.

The selection of Logwin Thiel and later Supreme as a supplier of Subway products was made by EIPC. EIPC services Subway franchisees for the countries in Europe which have at least 40 Subway stores. It is an independent franchisee member organization that serves as a purchasing agent; it organizes the distribution system for the supply of Subway products and negotiates the purchase from suppliers for that region at the best rates. Cetintas Tr. 60-61. EIPC periodically takes proposals and accepts new bids for the supply of Subway products. During the term of Respondent's operation as a Subway store from December 2008 to August 2009, two different suppliers were selected by EIPC, first Logwin Thiel and then Supreme. Prior to Logwin Thiel in or about 2005-2006 Intertrade had been the supplier.

14

While Greece is not technically part of the EIPC group since it does not have over 40 Subway stores, as there was at the time no local source of supply, EIPC and the selected suppliers facilitated the supply from those entities to the Greek Subway stores as a matter of good will in order to enable the Greek franchisees to operate by providing a source of supply. Cetintas Tr. 61-62. The Greek franchisees were not required to purchase from these entities. In fact the Athens Development Agents, whose job it was to help the franchisees find food sources, were repeatedly and throughout the relationship encouraged to find local sources and did use local sources for certain products.

Respondent claims that SBIV failed to assist her in identifying local suppliers and approving their utilization. The Franchise Agreement ¶ 5(m) provides:

> " You (the franchisee) will locate sources for the required food and equipment to operate the restaurant in compliance with this agreement and the Operation Manual. You acknowledge that you may experience significant difficulty in doing so in your market."

Thus the sourcing of products was clearly set forth in the contract as the responsibility of the franchisee located in the market and the difficulties that could be encountered were specifically pointed out.  Respondent was to be assisted by Ms. Bletas and Mr. Bletas, the Development Agents who were located with her in the Athens market. SBIV does not maintain staff in the many countries in which it has franchisees and so the responsibility for sourcing supplies locally is upon those who are local, the franchisees and the development agents.

The proof showed that while local products were first identified in 2005, no local products were sent to SBIV in compliance with the required approval process until the summer of 2008. Respondent relies on the affidavit of Angelos Ougiaridis which states that he could have supplied local Greek products to the Subway stores at a lower cost than Logwin Thiel; but he provides no specifics. The Tribunal credits the conflicting contemporaneous statement by Ms. Bletas on December 23, 2008 in a communication to Subway that:

> "Greek Das were and are still working to find local suppliers but the conversations are most of the time not productive because the Greek suppliers cannot afford to create a production line of Subway products at the costs we demand,"

Hearing Ex. R- 11.

15

The Tribunal concludes that local Greek suppliers were ultimately not pursued, not because SBIV failed to approve them as now claimed, but because local Greek suppliers could not provide products at a competitive price as stated by Ms. Bletas at the time. There was no evidence presented that demonstrates that SBIV improperly failed to approve local sourcing in Greece. Indeed, any such contention is belied by the fact that SBIV had approved local supply sourcing for Greece's neighbors, Bulgaria and Turkey, countries under the supervision, like Greece, of Ms. Cetintas as District Development Manager.

Finding that local sourcing was not an economically viable option, at the very end of 2008, Respondent's Development Agent turned to the possibility of importing food from Greece's neighbor Bulgaria, believing the goods would be priced more cheaply and that the transportation costs would be much lower than the very high costs of importing from Logwin Thiel in Germany.  Respondent claims that SBIV failed to properly assist in arranging for supply from Bulgaria. This claim is not supported by the evidence.

SBIV had some concerns about using the Bulgarian product in the Greek market as the Bulgarian products which were still in the improvement stage were only 80% to Subway standard and with the large number of tourists who frequented Subway in Greece accustomed to 100% Gold standard, careful thought had to be given to the introduction of the lesser product in Greece. In addition a comparison of food costs between Bulgaria and Greece showed that the food costs as a percentage of sales in Bulgaria were 40% as opposed to 32% in Greece. Cetintas Tr. 468-470.Thus an informed decision which took into account all factors, and importantly the transportation costs which would be critical to the cost analysis, was required before a change could be made. This was an important decision and could not be made quickly. Respondent's Development Agents, who were local and familiar with local possibilities and bore the responsibility for sourcing in the market, were asked to explore the transportation possibilities both in terms of cost and product safety with delivery to the hot Greek Islands,[3] factors required before a final decision could be made.

---

[3] For example, the Bulgarian supplier was not at that time able to deliver frozen bread appropriately even within Bulgaria.

16

Respondent contends that they were unable to develop information about the transportation costs because SBIV failed to provide the Bulgarian suppliers names and contact information when requested. While in one e-mail in January of 2009 SBIV states that it wishes to control communication with the Bulgarian suppliers as the approval process for them was still underway at SBIV, and asked Ms. Bletas to do the analysis of the transportation costs, C. Ex-28, the record shows that Respondent or their Development Agent did in fact have the name and contact information for a bread Bulgarian supplier by mid-January 2009 with which they could have started the analysis. The evidence further shows that SBIV arranged for a Bulgarian meat supplier to meet with the Greek franchisees in March of 2009 to further discuss the possibilities.[4] There is no evidence in the record that Respondent or her Development Agent delivered any analysis of transportation costs to SBIV which was required before the next step could be taken since the total pricing was a critical part of the analysis. The Tribunal concludes that SBIV moved forward at its end with proper speed in assisting with the possibility of taking this large and important step in the Greek market.

Respondent claims that there was a violation of competition law in connection with the supply of goods. There was no evidence presented that SBIV had any ownership or financial interest in EIPC (the supplier organizer) or Intertrade, Logwin Thiel or Supreme (the three companies selected to supply in different years between 2005 and 2009) or that SBIV had any interest in the identity of the supplier of Subway products other than to ensure that products sold in Subway stores met Subway standards, as was its right as the franchisor to protect the brand name and assure safety. There is no credible evidence that SBIV did not permit its franchisees to develop their own local sources of supply. There is no support for and Respondent has presented no persuasive argument for any claim of a violation of any competition law.

In short, the Tribunal finds SBIV did not breach ¶ 5 (m) of the Franchise Agreement, did not engage in any activity in violation of any competition law, and did not act in bad faith in connection with the supply of goods to Respondent.

---

[4] The tribunal did not find credible Ms. Bletas' testimony that she was unable to get the contact information from the Bulgarian supplier because Ms. Cetintas took his business card first, Bletas Tr. at 1306, when it was Ms. Cetintas herself on behalf of SBIV who arranged for and brought the Bulgarian supplier to meet the Greek franchisees.

**Counterclaim Related to the "Female Initiative"**

Respondent claims that SBIV's delay in issuing the franchise agreement caused her and her mother to forfeit a governmental award. There was an investment program known as the "female initiative" sponsored by the Greek government pursuant to which an award of 18,000 Euros would be given for starting a business that employed 0-9 people. Sixty per cent of the awards were to go to women. But for SBIV's delay Respondent and her mother would have each qualified for the subsidy. Mouka Affidavit, Ex.R- I.[5] The Tribunal finds that SBIV's delay in issuing the franchise agreement caused Respondent and her mother to lose this opportunity and entitles Respondent to an award of 36,000 Euros.

**Counterclaims Relating to Mistake of Fact and Negligent Statements**

Respondent claims that SBIV improperly represented itself as "#1 franchise." The sole document presented by Respondent which had such a description, Ex. R-7 at p. 1, is a copy of a web page which under the heading "press releases" in a side bar states "Subway Restaurants Again Named #1 Franchise Opportunity." Respondent did not provide the press release itself so that the full text could be examined. From the description, however, it appears to be providing a link to a press release which reports on another organization identifying Subway as the #1 franchise opportunity. Since Respondent has provided no evidence that Subway was not named the #1 franchise opportunity as the web site indicates, there can be no finding of a misrepresentation.[6]

Respondent contends that she relied on the "Sales Prediction Chart," Hearing Ex. R-37, as promising her a certain sales volume for her store. The document shows the days of the week, the times of day and has filled in in handwriting a number of sandwiches to be sold in each time interval. The work sheet was prepared in July of 2008 several weeks after the first franchise agreement was executed when Ms. Cere came to the U.S. came to be trained on the Subway

---

[5] There was confusion in the organization of Respondent's exhibit books at the hearing. All parties made a good faith effort to address the issue but certain documents were omitted from the exhibit book as delivered. Missing exhibits, including this one, were delivered by Respondent's counsel by e-mail.

[6] Claimant's counsel stated that the reference must be to an article and rating in Entrepreneur Magazine which has for many years given Subway that #1 franchise rating. This explanation is consistent with the document in the record.

18

system. There was no suggestion at the hearing that the SBIV trainer that was helping to train Ms. Cere knew anything about the Greek market or knew anything about Athens. The document was completed based on information provided by Ms. Cere herself. Cere Tr. at 1004-1005. The Tribunal finds that Ms. Cere could not have reasonably relied on the document as a prediction by SBIV of her sales volume when she is the one that provided the information upon which the work sheet was based.   The Tribunal credits as truthful Respondent's affirmation on two occasions in the two Disclosure Questionnaires she signed, Ex. C- 4 and Ex. C- 5, that no SBIV representative had made any statement or promise as to projected earnings, likelihood of success, or revenues that was not in the Offering Circular.[7]

Respondent complains that she was not informed of a lawsuit that was commenced concerning the transfer from SFAFT to IFAF. An addendum to the Offering Circular dated October 1, 2008, Ex. C-34,   reported on that law suit as an amendment to the litigation section of the Offering Circular.  Respondent signed a confirmation on October 8, 2010, Ex. C-33, that she had received the Offering Circular which included this addendum prior to signing the Franchise Agreement on November 13, 2008. SBIV was only added as a defendant in that lawsuit in September of 2008, so SBIV had no litigation disclosure to make  prior to that date in its EU offering circular.

In any event the Tribunal is not persuaded that the shift to IFAF would have been disadvantageous to the international franchisees which might have made such a disclosure, if required, material. The evidence showed that in January of 2009 a restructuring was effected for Subway advertising and the Subway franchise stores outside the U.S. Canada and Australia were shifted to IFAF as the needs of these less established markets were very different. SFAFT is controlled by franchisees.  IFAF, with a different structure, has directors and is also controlled by franchisees with five directors elected by the franchisees and two by SIBV. The manner in which advertising funds were handled did not change with the transition from SFAFT to IFAF. The same rules, policies and procedures governed both. Badalementi Tr. at 549.  Under both, the

---

[7] The parties stipulated that the only affirmative misrepresentations asserted by Respondent were those relating to the "#1 franchise" language and the work sheet. Stipulation dated March 26, 2010. Accordingly the allegation in Counterclaim ¶20 relating to assurances that Subway would grow in the marketplace is not dealt with in this award.

franchisees themselves in each district could decide how they wanted to spend the advertising dollars they had contributed. No proof to the contrary was offered.

Respondent contends that she entered into the Franchise Agreement under a mistake of fact and would not have entered into such an agreement had she been aware of the true facts. As set forth in the authorities provided by Respondent, a contract can only be voided based on a mistake of fact by one party if the other party caused or had reason to know about the mistake and failed to act to correct it or if the mistake is promptly disclosed before reliance on the contract. Ex. R-19 at p.18. There was no evidence introduced to support any inference that SBIV caused or was aware of any mistake of fact on the part of Respondent. Indeed, quite the contrary, the Disclosure Questionnaire specifically confirmed the Respondents' understanding of most of their current complaints.

The Tribunal finds that the Franchise Agreement cannot be voided based on mistake and denies Respondent's counterclaim for misrepresentation and omission.


**Section 879 of the Lichtenstein Civil Code**

Respondent contends that the Franchise Agreement was in violation of § 879 of the Lichtenstein Civil Code which provides that "A contract which violates a legal prohibition or public morality is null and void." Thus contracts considered to be grossly against good morals are void.

The Tribunal has reviewed the statements of Lichtenstein law as to §879 provided by Nicolas Reithner and, based on Mr. Reithner's analysis, accepted by Respondent, the Tribunal concludes that the Franchise Agreement is not against good morals and cannot be declared void. While regrettably the Respondent's stores in Athens did not prove to be successful in the difficult conditions faced in Athens at the time, the Franchise Agreement provides valuable rights to Respondent to the Subway System and Subway trade name which have proven to be of tremendous value to many others as is demonstrated by the 30,000 Subway stores in operation in 87 countries. The Franchise Agreement does not impose any immoral burdens or limitations on

20

Respondent. There is no basis for concluding that § 879 of the Lichtenstein Civil Code supports a finding that the Franchise Agreement is void.


### VII.   Standard of proof

Under Lichtenstein law evidence is only considered as being sufficiently proven when there is such a high probability that it leaves no reasonable doubt to anyone familiar with the circumstances of the case; this is said to mean that it almost equals certainty, or being 99% sure. Reithner Statement April 23, 2010. The Tribunal finds that its conclusions are supported not only under this Lichtenstein standard of proof but even under the less demanding standard of some other jurisdictions which only require a finding that a conclusion be more likely than not true.


### VIII.   Costs and expenses

Both Claimant and Respondent seek to recover attorneys' fees and costs. Claimant relies on §10 (o) of the Franchise Agreement which provides for payment of costs and fees if one party withholds payment from another party and so seeks to recover the costs of its collection action. As the bulk of the evidence and time expended in this proceeding concerned itself not with Claimant's collection efforts but rather with Respondent's Counterclaims, the Tribunal finds that the proper allocation of costs and fees is governed by ¶ 10 (a) of the Franchise Agreement. That section provides that in any arbitration between the parties, other than those specified in ¶ 10(o), each party shall be responsible for its own costs including attorneys' fees. Accordingly, Claimant's request for an award of costs and attorneys' fees is denied.

Respondent seeks an award of costs and attorneys' fees on the ground that Claimant acted in "bad faith" in the arbitration. The Tribunal finds just the opposite to be the case. Claimant's counsel extended every courtesy and accommodation to Respondent and her counsel and volunteered Claimant's own staff who spent considerable time to assist Respondent's counsel in organizing Respondent's exhibits to facilitate the proceeding with a more precise identification of documents.  Thus the Tribunal finds that Claimant acted in good faith, not bad faith, in the

conduct of this proceeding and Respondent's application for costs and fees on that basis is denied.

However, the Tribunal awards Respondent the cost of making photocopies for production in the amount of 1,800 Euros and for translation costs in the amount of 3,800 Euros. Claimant sought a considerable volume of documents which caused Respondent to incur considerable expense, and many of the documents translated for the benefit of Claimant were beyond those that Respondent sought to rely on at the hearing. Accordingly, Respondent is awarded 5,600 Euros for these document production and translation costs.

## FINAL AWARD

Based upon the findings and conclusions of the Tribunal set forth above, the following Award is ordered:

1. The Franchise Agreement between Subway International BV (hereinafter referred to as "Claimant") and Ornela Cere (hereinafter referred to as "Respondent") dated November 13,, 2009 with reference to Subway store number 45251 (the "Franchise Agreement") is terminated.

2. Claimant is awarded as against Respondent the sum of 765.25 Euros for the outstanding royalties and the sum of 315.31 Euros for the outstanding advertising fees for a total of 1080.56 Euros.

3. Respondent is awarded as against Claimant the sum of 36,000 Euros for the women's initiative.

4. Respondent is awarded against Claimant the sum of 5,600 Euros for the costs of document production and translation.

5. Within thirty (30) days from the date of transmittal of this Award to the Parties, Claimant shall pay to Respondent the net amount of 40,519.44 Euros.

6. Claimant's claim with respect to the alleged failure to disidentify the store and for sale of sandwiches in breach of the Franchise Agreement is denied.

22

7. Respondent's counterclaims are denied, with the exception of the award for the Women's Initiative and of the specified costs of document production and translation.

8. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling $9,950.00 shall be borne by the parties as incurred; the compensation and expenses of the Arbitrator totaling $8,400.00 shall be borne in equal shares by Claimant (50%) and Respondent (50%).

9. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.


I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.

August 2, 2010
_____
Date

Edna R. Sussman, Esq. Arbitrator


State of New York

                    SS:

County of New York


On this 2nd day of August, 2010, before me personally came and appeared Edna R. Sussman, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.


NOTARY PUBLIC

JACOB KAPLAN
Notary Public, State of New York
No. 02KA6187352
Qualified in New York County
Commission Expires May 19, 2012

23